**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

---

FRED DEVRIES and RUBY TEICH, individually
and on behalf all others similarly situated,

                        Plaintiff

     v.

MORGAN STANLEY & CO. LLC,
f/k/a Morgan Stanley & Co. Incorporated,
MORGAN STANLEY SMITH BARNEY LLC,
and MORGAN STANLEY,

                       Defendants.

Case No. 9:12-cv-81223-KAM

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION TO CONDITIONALLY CERTIFY AN FLSA COLLECTIVE ACTION AND**
**<u>AUTHORIZE NOTICE TO POTENTIAL CLASS MEMBERS</u>**

Plaintiffs' Motion to Conditionally Certify Collective Action and Authorize Notice [D.E. #68] ("Pls.' Mot.") does not provide a sufficient basis for a collective action involving approximately 6,970 pre-production Financial Advisor Associates ("FAAs") of Defendant Morgan Stanley Smith Barney LLC ("MSSB") in over 800 branches "throughout the United States."[1]  The multitude of reasons include the following:

- Contrary to Pls.' Mot., the "fairly lenient standard" does not apply because both sides requested a five month discovery period in which they completed extensive discovery, including for the purpose of conditional certification, and had an opportunity to fully investigate the relevant facts.

- Despite this discovery, Pls.' Mot. only consists of (1) deposition testimony from Plaintiff Teich and Opt-ins Aversano, Belshaw, Munsell, and Jasperse (collectively "Plaintiffs") specific to themselves, and (2) MSSB documents which completely comply with the FLSA.

- Despite this discovery, Plaintiffs, who worked in only five branches in four states, fail to demonstrate they are similarly situated to *each other*, much less to approximately 6,970 other current and former pre-production FAAs who worked in over 800 individual branches, with individual managers, in all 50 states.

- Despite this discovery, Plaintiffs fail to meet their burden of demonstrating that they and those they seek to join in this case are all victims of an *illegal* and *common* policy or practice to deny pre-production FAAs overtime for off-the-clock time worked.  To the contrary, discovery revealed that MSSB has and had robust policies and procedures requiring that all pre-production FAAs record and be paid for all time worked, specifically forbade any "off the clock" work, and encouraged employees to report violations.

- Sending an invitation to join to approximately 6,970 individuals, when it is clear now after discovery that there is no common illegal basis on which to adjudicate their claims, would saddle this Court with an unwieldy series of individualized mini-trials of unrelated claims and defenses and be contrary to the FLSA's goal of judicial efficiency.

---

[1] Plaintiffs were never employed by Defendants "Morgan Stanley & Co. LLC" or "Morgan Stanley."

I.      **BACKGROUND**

A.      **MSSB, The Branch Network, And The Pre-Production FAA Position.**

MSSB is a financial services company that provides brokerage and related products and services to millions of investors nationwide.  D.E. #67, ¶ 2.  Since August 2009, MSSB has had over 800 branches in all 50 states which together have employed approximately 6,970 pre-production FAAs.  Kout. Decl. ¶¶ 4-5.[2]  Most branches have an individual branch manager.  Kout. Decl. ¶ 4.

The pre-production FAAs' job is to "undergo a training period, typically four to six months" in which they complete the required FAA Training Program course work, study for and pass the Series 7 exam, study for and pass the Series 66 exam, study for and pass MSSB's FAA Pre-Production Assessment exams, attend meetings, complete all FAA Training Program curriculum requirements, and attend national performance sessions.  Pls.' Mot. 1-2, 4.  Only if they successfully complete the pre-production FAA training program are FAAs licensed and given a production number.  D.E. #68, p. 4, Ex. M, MS 908; Teich 14, Ex. 4, p.  Plaintiff 605.  Industry regulations require that pre-production FAAs not hold themselves out as Financial Advisors to clients and client prospects prior to having a production number and completing 120 days of industry service.  *Id.*  MSSB considers pre-production FAAs as non-exempt and eligible for overtime.  D.E. #68, p. 4, Ex. M, MS 908.

B.      **Plaintiffs' Individual Allegations.**

Each of the five Plaintiffs worked in a different location with different supervisors, and testified to very different personal stories on timekeeping and overtime, as discussed at pages 9-10, and 12-15 below.  Teich 20 (worked in a branch one Boca Raton, Florida); Aversano 9 (worked in one branch in Aventura, Florida); Belshaw 13 (worked in one branch in San Francisco, California); Jasperse 18-19 (worked in one branch in Hunt Valley, Maryland); Munsell 21, 38 (worked in one branch in Houston, Texas).

---

[2] Citations to the Declarations of Katherine Koutsantonis and Mark Zelek will be "Kout. Decl. ¶___" and "Zelek Decl. ¶___, " respectively.  Citations to the Plaintiffs' deposition testimony will be "[Last Name and page and/or Ex. number]."  Both Declarations and Plaintiffs' excerpts of deposition testimony will be filed concurrently with this Opposition.

C.    **Case History.**

On August 8, 2012, Plaintiff Fred Devries filed this case in the Southern District of New York as the lone plaintiff alleging a nationwide FLSA collective action.  [D.E. #1].  Although Devries worked in one branch in Florida, his Complaint did not target a particular supervisor, office, region, or time period.  Rather, it alleged a maximum class – the maximum number of individuals (all pre-production FAAs nationwide) for the maximum period of time allowed by the statute of limitations.  The case was transferred to the Southern District of Florida and on May 14, 2013 the court granted Plaintiff's Motion for Leave to File an Amended Complaint adding Ruby Teich as a second named plaintiff because Plaintiff Devries may not be able to proceed as the named Plaintiff in this litigation due to a serious medical issue.  [D.E. #28, 61, 65]

On December 7, 2012, the parties filed their Joint Scheduling Report in which they requested an initial period for discovery through March 31, 2013 limited to (1) the issue of whether Plaintiff's FLSA claims should be conditionally certified as a collective action, and (2) the merits of Plaintiff's claims. [D.E. # 42].   On December 12, 2012, the Court entered its Order Setting Trial Date and Discovery Deadlines which set the Discovery Cutoff for April 1, 2013.  [D.E. #43]. Thereafter, the Court granted an agreed motion and a joint motion for extensions of time to complete discovery through May 17,  2013.  [D.E. # 53-54, 64, 66].

II.    **ARGUMENT**

A.    **The Court Should Exercise Its Discretion To Deny Collective Action Certification.**

1.    **Judicial Efficiency is the FLSA Certification Procedure's Primary Concern**

The Supreme Court has authorized district courts to exercise discretion to send notice to potential class members in collective actions brought under 29 U.S.C. § 216(b).  *See Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989).  The Court cautioned, however, that this discretion is not "unbridled," and must be exercised only "in appropriate cases."  *Id*. at 170.  Although "[c]ourt intervention in the notice process for case management purposes" is an appropriate use of the Court's power, "the solicitation of claims" is not, and "courts must be scrupulous to respect judicial neutrality."  *Id*. at 174.  Responding to "excessive" litigation filed after the original passage of the FLSA in 1938, Congress amended the FLSA in 1947 to provide additional protections for employers.  Pub. L. No. 52-49, secs. 5-7, 1947 U.S.C. Cong. Serv. 85.  Congress

declared in the statute itself that the explosion of FLSA litigation threatened to "bring about financial ruin of many employers and seriously impair the capital resources of many others," and that, in the absence of these limitations, "the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged." 29 U.S.C. § 251(a)(1), (4), (7). *See also, Hoffman-La-Roche*, 493 U.S. at 165, 173 ("The relevant amendment was for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers of the burden of representative actions.").

The touchstone for FLSA certification is judicial efficiency. Echoing the commonality requirement under Rule 23, the Supreme Court recognized that one of the primary purposes of allowing plaintiffs to proceed collectively is to provide the judicial system the benefit of "efficient resolution in one proceeding of *common issues of law and fact* arising from the same alleged [conduct]." *Hoffman-LaRoche*, 493 U.S. at 170 (emphasis added). "Courts require, therefore, that plaintiffs demonstrate there is a reasonable basis to conclude that they and other members of the proposed class have been treated in a similarly *illegal* manner." *Henderson v. Holiday CVS, LLC*, 2010 WL 1854111, at * 2 (S.D. Fla. May 11, 2010) (Marra, J.) (emphasis added), *citing Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (plaintiffs' proof must support the existence of "class-wide discrimination"). "The key consideration is that to be 'similarly situated,' there must be 'substantial allegations that potential members were together the victims of a single decision, policy, or plan." *Richardson v. Wells Fargo Bank, N.A.*, Civil Case No. 4:11-cv-00738, 2012 WL 334038, at *2 (S.D. Tex. Feb. 2, 2012) (quoting *McKnight v. D. Houston, Inc.*, 756 F.Supp.2d 794, 801 (S.D. Tex. 2010)). Where the court must adjudicate the claims individually, judicial efficiencies will not result and conditional certification should be denied. *Wombles v. Title Max of Ala., Inc.*, 2005 WL 3312670, at *5-6 (M.D. Ala. Dec. 7, 2005).

## 2.     The "Fairly Lenient Standard" Is Inapplicable Here

Plaintiffs heavily rely upon the "fairly lenient standard," citing the Eleventh Circuit's decision in *Hipp*. Pls' Mot. 2, 7-15. But the "fairly lenient standard" is inapplicable here because the Court has far more than minimal evidence in the form of pleadings and affidavits on which to base any certification decision, including the deposition testimony of the five Plaintiffs and extensive documentation produced in discovery. Zelek Decl. ¶ 2. The parties in this case

requested five months to complete discovery, including for the purpose of conditional certification, and had ample opportunity to fully investigate the relevant facts.

In *Miranda v. Blockbuster Inc.*, No. 04-CV-21810, Doc. No. 155 (S.D. Fla. March 14, 2005) (attached as Exhibit 2 to Zelek Decl.) (Jordan, J.), the Southern District of Florida observed that although the Eleventh Circuit in *Hipp*, generally outlined a two-tiered approach to guide district courts in deciding whether plaintiffs are "similarly situated" for certification purposes under § 216(b), the Eleventh Circuit also stated that "nothing in our circuit precedent, however, *requires* district courts to utilize this approach." *Miranda*, Ex. 1 at 6, *citing Hipp*, 252 F.3d at 1219 (emphasis added).  Moreover, the *Miranda* court noted that in adopting the two-tiered approach, the Eleventh Circuit relied on the rationale that there is "minimal evidence" at the notice stage in typical FLSA cases and that it was because of this "minimal evidence" – usually only consisting of the pleadings and any affidavits which have been submitted – a district court should use a "fairly lenient standard" in determining whether notice of the action should be given to potential class members. *Miranda*, Ex. 1 at 3, 8-9.

The court found that the *Miranda* case was in a very different posture than that envisioned in *Hipp* at the notice stage given that, unlike in the typical case where district courts apply the two-tiered approach, some discovery has already proceeded, specifically five depositions as in this case. *Id.* at 6.  Accordingly, the *Miranda* court concluded that to certify a collective action and allow notice to potential plaintiffs at this point in the case – where important discovery had already been conducted – would not achieve "the economy of scale envisioned by the FLSA collective action procedure," and decided to deny the motion for conditional certification without prejudice and first consider defendant's motions for summary judgment. *Miranda*, Ex. 1 at 8, quoting *Holt*, 333 F.Supp.2d at 1275 (citing *Hoffman-La Roche*, 493 U.S. at 170).

Similarly, in *Pickering v. Lorrilard Tobacco Co., Inc.*, 2012 U.S. Dist. Lexis 10421 (M.D. Ala. Jan. 20, 2012), the Middle District of Florida recently found that because the parties requested the opportunity to conduct four months of discovery solely for the purpose of conditional certification, "[t]he rationale for applying the fairly limited standard in *Hipp* no longer fits the procedural posture of this case.  It is appropriate, therefore, to apply a stricter, more searching standard of review than that advocated in *Hipp* for a first stage review."  *Id.* at *10-11, 25.  In making this decision, the *Pickering* court reviewed the decisional law of the district courts in the Eleventh Circuit and found the reasoning to be persuasive. *Id.* at *24-25.

*See also Wright v. Lehigh Valley Hosp.*, 2010 WL 3363992, at *3 (E.D. Pa. Aug. 24, 2010) (Noting that applying a minimal and lenient standard to cases where extensive discovery has taken place is an "inefficient and overbroad application of the opt-in system, . . . places a substantial and expensive burden on a defendant[,] . . . is at odds with the Supreme Court's recommendation to ascertain the contours of the action at the outset, and . . . does not comport with the congressional intent behind the FLSA's opt-in requirement, which was designed to limit the potentially enormous size of FLSA representative actions . . . [and] reduce excessive litigation spawned by plaintiffs lacking a personal interest in the outcome.") (quotations omitted).

Thus, it is not sufficient for Plaintiffs to make a "'modest factual showing' to meet their 'minimal burden'" and this case is completely distinguishable from all of the off-the-clock cases cited by Plaintiffs where this Court and other district courts have found the evidence of similarity to be sufficient for conditional certification.  Pls' Mot. 2-3, 6-16.  Among the facts this Court should consider are the "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations."   *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1261 (11th Cir. 2008) (citation, alterations, and internal quotation marks omitted).

### 3.    Plaintiffs Have Not Met Their Burden of Establishing Any Common Policy or Practice Requiring Pre-Production FAAs to Work Without Pay

Plaintiffs argue that they have met their burden based on the following nine factors (Pls.' Mot. 4-7):

1.    MSSB's "Playbook" for pre-production FAAs outlines the duties, responsibilities, requirements, and expectations for pre-production FAAs.  Pls.' Mot. Ex. G, MS 866-894.

2.    MSSB's pre-production FAAs all are subject to the same pre-production FAA Phase 1 On-Boarding, which is the Associate Checklist and Best Practices.  Pls.' Mot.  Ex. I, MS 910-911.

3.    All MSSB pre-production FAAs are subject to the various iterations of the MSSB Code of Conduct.  Pls.' Mot. Ex. J, MS 912-965.

4.    All MSSB pre-production FAAs are required to use the same timekeeping system, called MyTime.

5.      The five Plaintiffs were explicitly discouraged from recording, or instructed not to record, more than 40 hours in a workweek (or were told it would not even be captured), regardless of the hours they actually worked.

6.      Pre-production FAAs regularly studied over 40 hours in a workweek in order to pass exams, as part of the rigorous pre-production FAA training process during pre-production.

7.      The Program Description for the FAA position is uniform across the country for pre-production FAAs.  Pls.' Mot. Ex. K, MS 1109-1110.

8.      MSSB's job postings throughout the United States are uniform, and essentially identical for 49 of the 50 states.  Pls.' Mot. Ex. L.

9.      MSSB's pre-production FAAs all are subject to the same Compensation and Performance Guide which requires completion of all coursework, passing the Series 7 exam on the first attempt and by the eighth week of pre-production, passing the Series 66 exam by the second attempt, passing both parts of Morgan Stanley's FAA Pre-Production Assessment, and completion of all Curriculum Requirements and provides that all pre-production FAAs' compensation has the same three components.  Pls.' Mot. Ex. M, MS 895- 909.

Contrary to Plaintiffs' assertion, these nine factors do not satisfy their burden.  Factors 1-3 and 7-9 simply reference MSSB documents relating to pre-production FAAs.  But the documents referenced in factors 1, 2, 7, and 8 do not even address time recording or overtime, much less that pre-production FAAs need to work overtime or would not be compensated for it. *See e.g.*, Teich 45, Ex. 8.  *See Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (rejecting argument that job descriptions were "evidence of a national policy or plan" because "[n]owhere do these documents state that these duties are to be performed without compensation if done outside an employee's regular, assigned shift hours"); *Velasquez v. HSBC Finance Corp.*, 266 F.R.D. 424, 426 (N.D. Cal. 2010) (denying conditional certification of off-the-clock claims despite uniform job description).

Moreover, although the documents referenced in Factors 3 and 9 do address wage and hour issues, there is nothing in them that is illegal.  To the contrary, they express that MSSB's policy and procedure prohibits off-the-clock work.  Factor 3 references MSSB's Code of Conduct which prohibited falsification of records, and provided multiple avenues, including to Human Resources and the Legal Compliance Division, for employees to report complaints or concerns

without retaliation.  Pls.' Mot. Ex. J, MS 920, 937, 944-46, 962.  Moreover, factor 9 references

MSSB's Compensation and Performance Guide, which specifically states:

> During your pre-production training and continuing until your class goes into production, you will be considered a non-exempt employee.  This means that you will be paid overtime if your hours worked in a given week exceed 40 hours. . . .  All overtime must be pre-approved by your Manager.  Upon receiving a production number and your class going into production, your status will be changed to exempt, meaning that you are no longer entitled to overtime.  FAAs are required to complete their timesheets accurately reflecting all hours worked during the pre-production phase.

Pls. Mot. Ex. M, MS 908.[3]

As to factor 4, MSSB does indeed have an electronic timekeeping system in which all pre-

production FAAs input their own start and stop work times to the minute and submit their time

---

[3]  In addition, MSSB has had written overtime policies in place during the past three years applicable, and available, to all pre-production FAAs.  The policy in effect from December 9, 2009 through September 15, 2012 stated:

> All non-exempt employees are required to maintain accurate time and attendance records.  Failure to do so may result in disciplinary action up to and including termination.  If any third party suggests or directs that an employee submit a false or inaccurate time sheet, the employee is required to notify Human Resources immediately.  Firm policy prohibits retaliation against anyone who makes such a report to human resources.

Kout. Decl. ¶ 9, Ex. B.

The policy in effect from September 15, 2012 through the present states:

> All . . . Non-Exempt employees are required to maintain accurate records of all time worked, inclusive of work time executed on a Blackberry, iPad or otherwise through remote access to the Firm's systems.  Overtime worked must be recorded even if not authorized in advance.  All meal periods in which the employee is free from work responsibilities must be accurately recorded and employees who were not provided with all meal or rest periods on account of work must record that as well.

> Any questions about overtime eligibility, including questions about unpaid overtime should promptly be directed to Human Resources.

> Knowing submission of false time records will result in disciplinary action up to and including termination of employment.  If anyone suggests or directs an employee to submit a false timesheet or otherwise requires an employee to work without recording the work time, the employee must immediately notify Human Resources.

Kout. Decl. ¶ 10, Ex. C.

directly to the system themselves.   Kout. Decl. ¶ 5.   However, for each payroll period, pre-production FAAs are required to check a box approving their time as accurate and to verify the following:

> **I acknowledge that I have reviewed this time sheet, that it accurately reflects all of the time that I worked on the dates indicated, and that I did not work at any other times during the payroll period that are not recorded on this time sheet.   I understand that I should consult my Human Resources representative if I have any questions or concerns regarding my compensation, work hours, or the information contained on this document.**

*Id.* ¶ 6, Ex. 1, MS 908.   *Richardson*, 2012 WL 334038, at **5-6 (denying certification where timekeeping system "permitted employees to input or edit the entries to reflect actual hours worked"); *Seward v. Int'l Bus. Machs. Corp.*, No. 08-cv-3976, Doc. No. 170, at 42-43 (S.D.N.Y. Jan. 20, 2012) (attached as Exhibit 3 to Zelek Decl.), adopted in entirety by 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012) (decertifying class where employees could manually override timesheets).

As to factors 5 and 6, none of the Plaintiffs assert that they were expressly asked or directed by their managers to perform tasks outside of work hours off-the-clock.   *See Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (dismissing off-the-clock claim where plaintiff was not directed by her supervisor to perform such work).   And what, when, and by whom (non-managers vs. managers) Plaintiffs were allegedly told about time recording varied widely.   Teich testified that the only conversation she had about time recording was with the *assistant* of her branch manager who told Teich the first time Teich entered time that she had "to put 8:30 to 12:00 and then 12:30 to 17:00 or something like that [and that] it could not be any more or any less[, i]t had to be exactly that."   Teich 56-57.   Teich did not have any conversations with anyone in MSSB management about entering her time.   Teich 57, 63-64.   Belshaw testified the only conversation he had about time recording was with his immediate supervisor *over four months after Belshaw started* and just one month before he went into production that "you will not be paid overtime, so do not put anything over 40 hours of work on your timesheet."   Belshaw 13, 29-30, 75-76.   However, Belshaw acknowledged that he was, in fact, paid overtime.   Belshaw 26-27, 73.   Aversano testified that the only conversations he had about time recording were at the very beginning with a *non-supervisor* comptroller who said Aversano was "not allowed to clock in overtime" and "can only do overtime if it is approved by management," and with a fellow pre-production FAA who said that the clock-in schedule was from 8-12 and 12:30 – 4:30.   Aversano 20-21, 23, 34-36, 53-54, 70, 82-84.   Munsell testified that the only conversation she had about time

recording was with the *administrative assistant* to the branch VP at the beginning of her employment that she was not allowed to put in more than 40 hours a week.  Munsell 25-27, 34. Finally, Jasperse testified that he really reported to no one, but the branch manager told him during his first pay period "that the computer system was only going to record 40" and that after hours "just go over your studies."  Jasperse 41-42, 60-61, 83.

These stark differences among alleged instructions from managers and non-managers render collective treatment improper.  *See Rodgers v. CVS Pharmacy, Inc.*, 2006 WL 752831, at *5 (M.D. Fla. Mar. 23, 2006); *Epps v. Oak Street Mortgage LLC*, 2006 WL 1460273, at **7-8 (M.D. Fla. May 22, 2006) (denying collective treatment of off-the-clock claims because "even . . . if it is determined that a manager in one of the branch offices forced a Plaintiff or opt-in Plaintiff not to record overtime, it will not necessarily establish liability as to . . . other[s] . . . in that same office or . . . in the other three branch offices"); *Richardson*, 2012 WL 334038 at *4 ("The fact that three or four managers allegedly required or condoned off-the-clock work is insufficient to warrant the complex, enormous, nationwide class that Plaintiffs request.  It is clear that resolution of each Plaintiff's claim will require individualized inquiries about his or her specific manager's policies and practices.").

### 4.     The Only Common Policies Are Lawful, Meaning That Any Deviation Requires Individual, Case-By-Case Adjudication

The only common policies are: (1) pre-production FAAs are responsible for accurately reporting all time worked, and (2) MSSB pays them for all of it.  The Court is thus left to consider only alleged deviations from Defendants' lawful policies.  "In the absence of any evidence tending to show that Defendants routinely breached the FLSA's pay provisions, these deviations are case-specific and subject to variables, making them unfit for a collective action." *Andersen v. Wells Fargo Fin., Inc.*, 2012 U.S. Dist. LEXIS 23175, at *20 (S.D. Iowa Feb. 6, 2012).

Even under a standard requiring a "modest" factual showing, numerous courts across the country have denied conditional certification where the plaintiffs failed to demonstrate any *common, unlawful* policy or practice because the employer, like Defendants, had implemented written policies requiring the recording and payment of all time worked.  *See, e.g.*, *Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (denying conditional certification of FLSA off-the-clock claims for personal bankers where  a written policy required

payment for all hours worked because, despite similar allegations from plaintiffs, there was no evidence of a "national company-wide decision, policy or plan to deny personal bankers overtime pay" and the "resolution of each Plaintiffs claim will require individualized inquiries about his or her specific manager's  policies and practices"); *Carey v. 24 Hour Fitness USA, Inc.*, 2012 WL 4857562 (S.D. Tex. Oct. 11, 2012) (denying conditional certification off-the-clock case because whether each putative collective action member's "[m]anager would be willing to violate the . . . written company policy against 'off-the-clock' work also requires an [individualized] inquiry into the motivation and ethics of each . . . [m]anager"); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347-48 (W.D.N.Y. Feb. 23, 2011) (denying conditional certification where stores had policies limiting hours and financially rewarding managers who kept to the limits, holding that such "facially-lawful policies" cannot "form the equivalent of a 'common policy or plan that violate[s] the law" despite plaintiffs allegation that this created incentives for managers to shave time or assign off-the-clock duties).

Here, Plaintiff asks the Court to extrapolate the individual experiences of just five people – with widely varying experiences – who account for less than 0.07% of the approximately 6,970 pre-production FAA's Plaintiffs purport to represent.   "Such a limited sampling of employees does not support Plaintiff's assertion of widespread violations resulting from a common policy or plan." *West v. Border Foods, Inc.*, 2006 WL 1892527, at *6 (D. Minn. July 2006) (denying notice where plaintiffs only produced evidence that 2.5% of the potential class might have been required to work off-the-clock). *See also Delano v. Mastec, Inc.*, 2011 WL 2173864, at *5 (M.D. Fla. June 2011) ("[F]ederal courts across the Middle and Southern Districts of Florida have routinely denied requests for conditional certification where plaintiffs attempt to certify a broad class based only on the conclusory allegations of a few employees."); *Creel v. Tuesday Morning, Inc.*, Civil action No. 2:09cv728-MHT, Doc. No. 45, at 16 (M.D. Ala. May 6, 2013) (attached as Exhibit 4 to Zelek Decl.) (denying certification of a putative national collective action including over 1250 members where, after extensive discovery, the plaintiff presented only her own testimony and four other affidavits representing three states and finding "[t]his evidence does not provide an adequate platform from which to make the grand leap to a national collective action."); *Thompson v. Speedway SuperAmerica*, LLC, 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (denying notice where only eight plaintiffs (less than 1%) submitted

declarations); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (2 out of 50 employees (4%) held insufficient to show a common policy or plan).

### 5.    Plaintiffs Are Not Similarly Situated Even to Each Other

To establish liability, Plaintiffs must prove, and the Court must determine, a number of individualized issues for each pre-production FAA for each work week that he or she worked, including the following: the number of hours worked each workweek; whether the pre-production FAA was directed to perform the alleged work (*See* p. 10-11 above),[4] whether the pre-production FAA requested permission to work overtime and whether the request was approved or denied,[5] whether and to what extent the pre-production FAA was paid overtime,[6] whether the alleged uncompensated work during each workweek was compensable under the applicable standards,[7] and whether the manager had actual or constructive knowledge that the pre-production FAA had engaged in compensable work without recording and being paid for it.[8]

As set forth below, on the elements needed to establish liability for overtime, the Court need not now make a factual determination as it is evident from the testimony of the Plaintiffs themselves that these issues are individualized.  Were the current Plaintiffs to proceed to trial, each

---

[4]  *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where plaintiff was not directed to perform work off-the-clock, though she was directed to complete duties).

[5]  *Newton v. City of Henderson*, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime).

[6]  *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) ("Because [the employer] did in fact pay some overtime, it is likely that any particular [off-the-clock] claim will require specific, individualized proof as to any hours that [employer] refused to pay.").

[7]  *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying certification where individualized defenses included whether activities were preliminary or postliminary); *Zivali v. AT&T Mobility LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011) (decertifying collective action in part because the de minimis doctrine defense would require an individualized inquiry that would "vary widely according to the particular situation of each individual plaintiff.").

[8]  *Laplante v. Terraces of Lake Worth Rehabilitation and Health Center, LLC,* 725 F. Supp. 2d 1358, 1361 (S.D. Fla. 2010) (Marra, J.) (To recover for uncompensated overtime work under the FLSA, a plaintiff has the burden of demostrating the employer had knowledge or should have had knowledge of that overtime work.); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3. (D. Nev. Dec. 12, 2006) (denying conditional certification where individualized inquiry would be required into whether each supervisor knew about the off-the-clock work).

would have to testify in support of his or her own claim, and Defendants would have to be permitted to introduce contrary evidence as to each claim.

Whether and the Extent To Which They Worked Overtime.  Plaintiffs lack any common basis to determine the extent any pre-production FAA had to work overtime.  Munsell testified that she worked between 10 and 25 hours of overtime per week and was "definitely" required to spend more time studying than someone who, unlike her, worked in the industry before.  Munsell 59-60, 72-73.  According to Munsell, some pre-production FAAs already had the Series 7 and 66 and were able to build a business plan during the study phase and did not have to study.  Munsell 58-60.  Munsell testified that it was "much more doable" to do the pre-production FAA job in 40 hours if one already had a Series 7 or 66.  *Id.*  Teich testified she would do 20 to 30 hours of overtime a week exclusively from home.  Teich 26-28, 30, 58-59, 67.  Belshaw testified he worked between 25 and 35 hours per week of overtime.  Belshaw 22.  Aversano testified he worked from home an average of 20-25 hours a week.  Aversano 86-87.  And Jaspere testified he worked between 35 and 40 hours of overtime each week.  Jasperse 85.

Whether Overtime Was Requested, Approved or Paid.  Although none of the Plaintiffs ever sought prior management approval for working overtime (Teich 42; Belshaw 29-30; Aversano 20-21, 23, 34-36, 53-54, 70, 82-84; Munsel 24-25, 27; Jasperse 24-25), two of the five Plaintiffs (Belshaw and Aversano) recorded and were paid for overtime.  Belshaw 26-27; Aversano 17.

Whether A Manager Knew Or Should Have Known That A FAA Worked Unpaid Overtime.  Resolving the claims of the entire proposed class would require the Court to make a fact-intensive inquiry into whether and how much each of the hundreds of supervisors and managers knew about any alleged off-the-clock work by each of the thousands of pre-production FAAs, making testimony from individual managers crucial.  The individualized inquiry that would be necessary here on the "knew or should have known" issue is amply demonstrated by the widely divergent testimony of the five Plaintiffs.  Aversano testified he does not know whether MSSB knew or should have known he worked uncompensated overtime.  Aversano 84.  Munsell testified that she never told her supervisors she was working overtime and not being paid and was not told by her supervisor when she had to be in the office.  Munsell 35, 55, 77.  Teich testified that while a pre-production FAA she worked from home between 50% and 70% of the time and often would not even go into the branch on Mondays through Fridays.  Teich 26-27, 30, 58-59. Teich also testified that she was in the office from 8:30 to 5:00 while she was a pre-production FAA "not that

many" days, and does not recall any week where she was in the office for over 40 hours.  Teich 27-28, 68.  Teich further admits that her supervisors never saw her working more than 40 hours a week or working hours for which she was not being paid.  Teich 64, 68.

On the other hand, Belshaw testified that he spent roughly 50 hours a week in the office and mentioned to his supervisor that it was a lot of work.  Belshaw 40-41.  Further, Jasperse testified he told his branch manager how many hours he was working although he did not complain about what he was getting paid.  Jasperse 92.  Jasperse also testified that in the just under two months he worked for MSSB he worked "not more than than a half dozen days" from home, and none of his supervisors saw what he was doing outside the branch.  Jasperse 41, 94-5.

Moreover, while one manager had a clear sight from his desk to the pre-production FAA (Munsell 41), others could not see the pre-production FAA from their office (Teich 25, 34; Belshaw 56, 61-62; Aversano 28-29; Jasperse 45), others were on a different floor (Aversano 20-21; 27-28; Munsell 40-41, 53), and another was in a different location altogether (Teich 25, 34-35).  Furthermore, whereas Teich testified that one of her managers was in her office "not very often" when she was a pre-production FAA (Teich 25, 35-36), Belshaw testified that his managers looked over at him "all the time."  Belshaw 71-73.  *See Joza*, 2010 WL 3619551, at *10 (rejecting argument that employer was on notice of unpaid overtime because "managers periodically passed by her cubicle and should have noticed that she was there during the usual lunch period and outside of her assigned shift hours.").

These individualized inquiries make the certification of a collective action in this proceeding unwarranted.  *Richardson*, 2012 WL 334038, at *1 n.1 (denying conditional certification despite allegations of off-the-clock work by nine plaintiffs and opt-ins); *Hinojos,* 2006 WL 3712944, at *1-3 (the mere fact that six plaintiffs and five declarants alleged they worked off-the-clock did not show improper common policy justifying conditional certification); *West v. Verizon Communications, Inc.*, No. 8:08-cv-1325-T-33MAP, 2009 WL 2957963, at *7 (M.D. Fla. Sept. 10, 2009) (denying class certification in an FLSA case: "The need for individualized inquiries would contravene the basic theory of judicial economy upon which the certification of collective actions is based."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004) (denying class certification in an FLSA case: "the court is not satisfied that conditionally certifying a nationwide collective action, or even a regional collective action, will partake of the economy of scale envisioned by the FLSA collective action procedure").

### 6.        Fairness and Procedural Considerations

No legitimate purpose would be served by sending notice to approximately 6,970 pre-production FAAs inviting them to file claims that would not otherwise be filed when it is clear now that after five months of discovery there is no common basis on which to adjudicate the claims of all pre-production FAAs.  Such a result would be antithetical to a statute that has been amended to prevent "excessive litigation" and to promote judicial efficiency, and it would undermine the strong policies and procedures that employers like Defendants have put in place to prevent any uncompensated work.  To be sure, those policies do not immunize employers, but they certainly belie any claim of a class-wide policy or practice to do the opposite of what is mandated by the policy, and courts should not lightly disregard these good faith efforts to comply with the law.

Given that decertification on the highly individualized issue of off-the-clock work (*see, e.g.* cases cited at pages 8-15 above) is a near certainty, there is substantial harm and little to be gained through conditional certification in this context.  The fact that the Court can decertify at a later date does not mitigate the harm from sending notice to such a large group without a meaningful review of whether this case will be able to proceed as a collective action.  All of the Plaintiffs are former employees (Kout. Decl. ¶ 6), but authorizing notice has the most significant impact on current employees – turning them into litigation adversaries with their employer and suggesting to them that their employer is violating the law.  *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (premature notice to a nationwide class "surely cause[s] serious and irreparable harm to [defendant]'s reputation and to its relationship with its employees."). Moreover, Defendants are then required to litigate the merits of the claims of hundreds or even over 1,000 opt-ins – often to the eve of trial – before any meaningful review is conducted of whether these individuals can proceed in this case.  If it is determined that they cannot proceed in the case as likely, the parties and the Court will have wasted a tremendous amount of resources. Moreover, unlike Rule 23 certification, where individuals do not actually come into the Court, FLSA opt-ins file a consent to join and form an active attorney-client relationship.  Decertification often results in a multitude of individual cases.  Stirring up claims that would not otherwise be filed is a result counter to the purposes of judicial efficiency behind 29 U.S.C. § 216(b).

7. **Plaintiffs Have Not Met Their Burden of Demonstrating Other Individuals Who Desire to Opt-In**

Finally, before certifying an action as a collective action under § 216(b), the district court "should satisfy itself that there are other employees of the department-employer who desire to 'opt-in'…" *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). This is not a case like those cited on pages 12 and 14 of Pls. Mot. where the declarants and opt-ins constituted a much larger percentage and more geographically limited proposed classes than here. The fact that only seven of the approximately 6,970 potential class members (less than 0.10%) in all 50 states are in this suit nearly a year after filing and five months of discovery and no current employees of Defendants have joined this action gives rise to the inference that all who wish to join have already done so. *See Barrera v. Oficina, Inc.*, 2010 U.S. Dist. LEXIS 121864 at *6, 9 (October 28, 2010 S.D. Fla.). This is particularly the case here given that Plaintiffs' counsel has sent a continuous series of targeted email and LinkedIn solicitations about this case to 136 pre-production FAAs (including twice to 20 individuals, and three and four times to two others), providing them with a one-sided notice claiming that MSSB pre-production FAAs are not paid for all time worked, and the vast majority have declined to join or participate. Zelek Decl. ¶ 3, Ex. 1. In *Webber v. Coast Dental, P.A.*, No. 8:12-CV-1505-T33AEP, Doc. No. 48, at 4, 7 (M.D. Fla. Mar. 11, 2013) (attached as Exhibit 5 to Zelek Decl.), the Middle District recently concluded that the plaintiffs did not meet their burden of demonstrating that there were other employees who desired to opt-in where 184 individuals would fall within the class definition, but only four former employees and no current employees had joined in the litigation in its eight month duration. The *Webber* court noted "the FLSA has a broad remedial purpose, but . . . courts, as well as practicing attorneys, have a responsibility to avoid the stirring up of litigation through unwarranted solicitation," and conditional certification should "be exercised with discretion and only in appropriate cases." *Id.,* at 7 *quoting Holt*, 333 F. Supp. 2d at 1274-75 and *Hayne v. Singer Co., Inc.*, 696 F.2d 884, 886 (11th Cir. 1983).

B. **If This Court Were to Permit Any Further Notice, Which It Should Not, It Should be Limited Only to the Plaintiffs' Branches.**

Even if, contrary to the conclusive evidence discussed above, the Court concludes that Plaintiffs have shown some uniformity of experiences amongst themselves, they have not shown that such work was pursuant to a *nationwide* unlawful policy or practice. Courts that have

permitted any conditional certification and notice in such circumstances have generally limited notice to only those locations where the plaintiff submitted competent evidence that a violation may have occurred.  *See, e.g.*, *Haynes v. Singer Co.*, 696 F. 2d 884, 888 (11th Cir. 1983) (upholding trial court decision to not permit notice when only two plaintiffs, both of whom came from same store); *Wynder v. Applied Card Systems, Inc.*, 2009 WL 4857562, at * 3 (S.D. Fla. Oct. 7, 2009) (Marra, J.) (limiting notice to the Boca Raton location for which plaintiff offered evidence), *citing Gonzalez v. Hair Club for Men, Ltd., Inc.*, No. 6:06-cv-1762-Orl-28JGG, 2007 WL 1079291, at * 3 (M.D.Fla. Apr. 9, 2007) (motion for conditional certification of a company-wide collective action denied when affidavits from employees failed to show that alleged FLSA violations stemmed from a company-wide practice); *Harper v. Lovett's Buffet, Inc.* 185 F.R.D. 358, 365 (M.D. Ala. 1999) (limiting notice to hourly wage employees at one restaurant for which plaintiffs provided substantial detailed evidence of off-the-clock and other FLSA violations, rather than to all business locations throughout the Southeast); *Burkhart-Deal v. CitiFinancial, Inc.*, 2010 WL 457127, at *5 (W.D. Pa. Feb. 4, 2010) (limiting certification only to branches where plaintiff and individuals who submitted declarations in support of certification worked); *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 520-21 (D. Md. 2000) (authorizing notice for employees only at one nursing home facility, and rejecting request for nationwide notice, of off-the-clock claims because plaintiffs could not show actual or constructive knowledge by managers that employees were working off-the-clock).

### C.   <u>The Notice Requested By Plaintiff Is Inappropriate.</u>

#### 1.   **Form of Notice**

If the Court grants Plaintiffs' Motion for Conditional Certification and Notice, which, for the above stated reasons, it should not, Defendants agree that the parties should confer to finalize a form of Notice and Consent to Join that would be appropriate for this particular litigation.  While the notice used in *Amador v. Morgan Stanley* can serve as a starting point for negotiations, the parties should be allowed to confer – as this Court has ordered in other cases – to tailor the language in the notice to address the particular facts of this case and matters that have proven problematic in the *Amador* litigation.  *See, e.g. Anish v. National Securities Corp.*, 2012 WL 1906500, at * 4 (S.D. Fla. May 25, 2012) (ordering parties to confer on content); *Wynder*, 2009 WL 3255585, at *4 (same).  Defendants propose, for example, that to avoid disputes as to timeliness, the notice should specify that consents will only be timely if received by Plaintiffs'

counsel and filed with the court within 60 days of mailing of the notice.

### 2.   Form of Distribution of Notice

Defendants do not object to notice by email and first class mail; however, the notice should be sent only to the personal email addresses (if available) of putative class members as sending the notice to the work email of current employees would be unnecessarily duplicative and disruptive to the work place. *See Hinterberger v. Catholic Health Services Sys.*, 2009 WL 3464134, at *13 (W.D.N.Y. Oct. 21, 2009) (denying plaintiff's request for email notice and denying request to post notice in the work place because "the only group that would be reached . . . are current employees, who have an interest in providing their employer with an up-to-date mailing address."). There is no reason why clear written notice sent to an individual's home address and personal email is not a sufficient means of notifying the individual of the case and the opportunity to join. Pre-production FAAs should not be bombarded with notices. Nor should Defendants be subjected to the negative ramifications and confusion precipitated by a notice being delivered to their workforce through their internal systems, much less be required to pay personnel for the time they spend during working hours reading and evaluating the notice in lieu of attending to job responsibilities, especially when delivery to home addresses is a better alternative.

### III.   <u>CONCLUSION</u>

Defendants respectfully request that the Court deny Plaintiffs' Motion to Conditionally Certify an FLSA Collective Action and Authorize Notice to Potential Class Members. Alternatively, if the Court were to authorize notice, it should be limited to those pre-production FAAs who worked in the same branches as Plaintiffs.

Dated: July 12, 2013         Respectfully submitted,

/s/ *Mark E. Zelek*
Mark E. Zelek
Florida Bar. No. 66773
Anne Marie Estevez, Esq.
Florida Bar No. 991694
Email: aestevez@morganlewis.com
Annika E. Ashton, Esq.
Florida Bar No. 53970
Email: aashton@morganlewis.com
Morgan, Lewis & Bockius, LLP
200 S. Biscayne Blvd, Suite 5300
Miami, FL 33131

Thomas A. Linthorst, Esq.
(*admitted pro hac vice*)
Email: tlinthorst@morganlewis.com
Michelle Seldin Silverman, Esq.
(*admitted pro hac vice*)
Email: ssilverman@morganlewis.com
Morgan, Lewis & Bockius, LLP
502 Carnegie Center
Princeton, NJ 08540

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of Court using CM/ECF on July 12, 2013. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

**SERVICE LIST**
**Devries v. Morgan Stanley & Co, LLC, et. al**
**CASE NO.: 9:12-cv-81223-KAM**
**United States District Court for the Southern District of Florida**

Gregg I Shavitz, Esq.
Susan H. Stern, Esq.
Paolo C. Miereles, Esq.
**SHAVITZ LAW GROUP, P.A.**
1515 South Federal Highway, Suite 404
Boca Raton, FL 33432
Tel: (561) 447-8888; Fax: (561) 447-8831
***Via CM/ECF***

**and**

Seth R. Lesser, Esq. (admitted *pro hac vice*)
Fran L. Rudich, Esq.(admitted *pro hac vice*)
Michael Palitz, Esq.(admitted *pro hac vice*)
Rachel Aghassi, Esq. (admitted pro hac vice)
**KLAFTER, OLSEN & LESSER, LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel:  914-934-9200; (Fax) 914-934-9220
***Via CM/ECF***

*Attorneys for Plaintiffs and the Putative Class*

/s/ *Mark E. Zelek*
Mark E. Zelek