# EXHIBIT "2"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 04-21810-CIV-JORDAN

FILED by ___

MAR 1 4 20__

CLARENCE MADD__
CLERK U.S. DIST. __
S.D. OF FLA. MI__

JOANNE MIRANDA, individually, and on )
behalf or all others similarly situated )
)
        Plaintiffs )
)
vs. )
)
BLOCKBUSTER INC. )
)
        Defendant )
_____ )

### ORDER ON PLAINTIFF'S MOTION FOR CONDITIONAL CLASS CERTIFICATION AND ON DEFENDANT'S MOTION TO STRIKE

Joanne Miranda, individually and on behalf of all others similarly situated, filed this suit against Blockbuster Inc. for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. Specifically, Ms. Miranda alleges that Blockbuster has a policy and practice requiring its store managers to work in excess of 40 hours per week without being paid overtime compensation. On October 29, 2004, plaintiffs Jeffrey P. Russell and Susan Perdue joined this action by way of an amended complaint with written consent by Blockbuster pursuant to Rule 15(a) [D.E. 14]. On October 29, 2004, Mr. Russell and Ms. Perdue, along with Katherine Corthon, Scott LaClair, and Diana Studebaker, also filed consent forms to opt-in as plaintiffs. *See* Notice of Filing Consents [D.E. 15].

On November 4, 2004, Ms. Miranda, Mr. Russell and Ms. Perdue filed a motion for conditional class certification and to facilitate notice to absent class members under 29 U.S.C. § 216(b) [D.E. 16]. Blockbuster has filed a motion for summary judgment on the claims of Ms. Miranda [D.E. 38, 43], a motion for summary judgment on the claims of Mr. Russell [D.E. 66], and a motion to strike paragraphs in the declarations of Ms. Miranda, Mr. Russell and Ms. Perdue, submitted in support of the motion for conditional class certification. For the reasons stated below, Blockbuster's motion to strike certain paragraphs in the plaintiffs' declarations submitted in support of the motion for conditional class certification [D.E. 46] is DENIED, and the plaintiffs' motion for

conditional class certification and to facilitate notice to absent class members under 29 U.S.C. § 216(b) [D.E. 16] is DENIED WITHOUT PREJUDICE.

### I. STANDARD FOR CONDITIONAL CERTIFICATION OF A CLASS UNDER § 216(b)

The FLSA provides that an action for overtime compensation "may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Under § 216(b), a plaintiff must affirmatively opt into the action by filing his or her written consent with the court to be considered a class member and to be bound by the outcome of the action. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001). To maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are similarly situated. *Id.* at 1217.

The Eleventh Circuit outlined a two-tiered approach to certification under § 216(b) in *Hipp*. *See also Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 (11th Cir. 2001). At the "notice stage," the first tier of § 216(b) certification, the district court "makes a decision -- usually based only on the pleadings and any affidavits which have been submitted -- whether notice of the action should be given to potential class members." *See Hipp*, 252 F.3d at 1218 (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995)). At this stage, the determination is made using "a fairly lenient standard" because the court usually has minimal evidence and typically results in conditional certification of a representative class. *See id.* The second stage of the two-tiered approach typically occurs "by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *See id.* At this stage, "the court usually has much more information on which to base its decisions, and makes a factual determination on the similarly situated question." *See id.*

The Eleventh Circuit, in recommending this two-tiered procedure, noted that the procedure is an effective tool for district courts to use in managing complex cases, although "[n]othing in . . . circuit precedent . . . requires district courts to utilize this approach." *See id.* at 1219. The decision on whether to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court. *See id.* (citations omitted).

2

## II. ANALYSIS

On November 4, 2004, Ms. Miranda, Mr. Russell and Ms. Perdue moved for conditional class certification and to facilitate notice to absent class members. The motion became fully briefed on January 25, 2005. On January 14, 2005, Blockbuster filed a motion for summary judgment on the claims of Ms. Miranda [D.E. 38, 43] and a motion for summary judgment on the claims of Mr. Russell [D.E. 66]. Blockbuster also filed a motion to strike paragraphs in the declarations of Ms. Miranda, Mr. Russell, and Ms. Perdue [D.E. D.E. 46], which were submitted in support of the motion for conditional class certification.

The court held a hearing on February 18, 2005, on the plaintiffs' motion for conditional class certification and Ms. Miranda's motion for a continuance of Blockbuster's motion for summary judgment under Rule 56(f).[1] At that hearing, the plaintiffs argued that the motion for conditional class certification should be decided before Blockbuster's motions for summary judgment. Specifically, the plaintiffs contend that the "fairly lenient standard" at the notice stage under *Hipp* requires the court to grant conditional certification of the class before engaging in a detailed analysis of the plaintiffs' job responsibilities and exempt status for purposes of Blockbuster's summary judgment motion. In the plaintiffs' view, summary judgment should instead be considered in the second stage of the two-tiered approach, where the court may also decertify the class if summary judgment is granted in favor of Blockbuster. Blockbuster contends, however, that the court should decide the motions for summary judgment before this case proceeds as a collective action. Under this rationale, if the court disposes of the summary judgment motions first, and chooses to grant summary judgment in favor of Blockbuster (by concluding that Ms. Miranda is exempt from the overtime provisions of the FLSA), then conditional class certification and notices for thousands of potential plaintiffs would be unnecessary.

---

[1] I subsequently granted Ms. Miranda's motion for a continuance of defendant's motion for summary judgment under Rule 56(f) on February 22, 2005 [D.E. 78], and permitted Ms. Miranda until the close of discovery, on March 28, 2005, to conduct discovery for her response to Blockbuster's motion for summary judgment. The responses by Ms. Miranda and Mr. Russell to Blockbuster's respective motions for summary judgment are due on April 11, 2005.

3

### A. MOTION TO STRIKE DECLARATIONS

Blockbuster moves to strike certain paragraphs in the plaintiffs' declarations submitted in support of their motion for conditional class certification. Specifically, Blockbuster contends that the paragraphs in the plaintiffs' declarations should be stricken because they are not based on personal knowledge and are inconsistent with their deposition testimony.[2]

Blockbuster first argues that certain paragraphs in the plaintiffs' declarations should be stricken because they are not based on personal knowledge pursuant to Federal Rule of Evidence 602 and Federal Rule of Civil Procedure 56(e). Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Rule 56(e) provides that affidavits supporting and opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The plaintiffs argue that declarations are not required to be made on personal knowledge, their declarations are not inconsistent with their deposition testimony, and that the court should not engage in a detailed examination of the declarations under the "fairly lenient standard" at the notice stage of the litigation.

Although Rule 56(e) provides that affidavits submitted for purposes of summary judgment must be made on personal knowledge, no such rule exists for affidavits or declarations made for purposes of a motion for conditional class certification. *See, e.g., Visser v. Packer Enng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (if testimony about matters outside of a witness' personal knowledge is not admissible at trial, "neither is it admissible in an affidavit used to support or resist the grant of summary judgment"). Indeed, the cases cited by Blockbuster in support of its motion to strike require affidavits made on personal knowledge only in the context of a motion for summary judgment or a motion to dismiss. *See Posner v. Essex Insur. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999) (accepting only portions of affidavit that set forth specific factual declarations within the

---

[2] Blockbuster seeks to strike paragraphs 7, 8, 10-15 of Ms. Miranda's declaration [D.E. 17], paragraphs 4, 6, 7, 8, 10-14 of Mr. Russell's declaration [D.E. 17], paragraphs 4,6,7,9-15 of Ms. Perdue's declaration [D.E. 17], and paragraphs 15-18 of the plaintiffs' motion for conditional class certification [D.E. 16]. *See* Motion to Strike [D.E. 46].

4

affiant's personal knowledge for purposes of resolving jurisdictional issue on motion to dismiss); *Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir. 1973) ("in summary judgment proceedings affidavits containing mere conclusions have no probative value"); *Maiorana v. MacDonald*, 596 F.2d 1072, 1079-80 (1st Cir. 1979) (giving little weight – but not striking – portions of affidavit opposing summary judgment because statements were not made on personal knowledge). Furthermore, the Federal Rules of Evidence are applicable when deciding a motion to dismiss or a motion for summary judgment but do not apply to the determination of some preliminary questions of fact under Rule 104. *See* FED.R.EVID. 1101(d)(1); *The Millgard Corp. v. White Oak Corp.*, 224 F.Supp.2d 425, 429 n.7 (D.Conn. 2002) (citing *Sfasciotti v. Copy-Plus, Inc.*, No. 85-C-6318, 1985 WL 5051, at *1 (N.D. Ill Dec. 23, 1985)). I have found no cases -- and Blockbuster has cited none -- where a federal court has applied Federal Rule of Evidence 602 or Federal Rule of Civil Procedure 56(e) to an affidavit or declaration submitted in support of a motion for conditional class certification under § 216(b) (or any motion other than a motion to dismiss or motion for summary judgment) by requiring that such an affidavit or declaration be based on personal knowledge.

Moreover, motions to strike are generally disfavored because of their drastic nature. *See, e.g., Augustus v. Bd. of Public Instruction of Escambia County, Florida*, 306 F.2d 862, 868 (5th Cir.1962); *Royal Ins. Co. of America v. M/Y Anastasia*, 1997 WL 608722, *3 (N.D.Fla.1997). Motions to strike are usually denied unless the matter to be stricken has no possible relationship to the controversy and may prejudice the other party. *See Poston v. American President Lines, Ltd.*, 452 F.Supp. 568, 570 (S.D. Fla. 1978) (citing *Augustus v. Board of Public Instruction*, 306 F.2d 862, 868 (5th Cir. 1962)). The paragraphs Blockbuster seeks to strike pertain to pay provisions, Blockbuster policies, and the scope of responsibilities for Blockbuster's store managers. Therefore, these paragraphs are related to both the issue of the plaintiffs' FLSA claim and to the motion for conditional class certification. Blockbuster has failed to show that these paragraphs have no possible relationship to the controversy.

Accordingly, Blockbuster's motion to strike certain paragraphs in the plaintiffs' declarations submitted in support of their motion for conditional class certification [D.E. 46] is DENIED. Although some of the statements in the plaintiffs' declarations may be construed as going beyond

5

the scope of the plaintiffs' personal knowledge or contradicting their deposition testimony, I decline to strike the paragraphs. I will, however, consider Blockbuster's arguments in ruling on the motion for conditional class certification, and in determining what weight to give to the declarations.

### B. MOTION FOR CONDITIONAL CLASS CERTIFICATION UNDER § 216(B)

The issue then remains whether I should follow the two-tier approach in *Hipp* and grant the plaintiffs' motion for conditional class certification before deciding on Blockbuster's summary judgment motion. The plaintiffs correctly note that class certification typically precedes a summary judgment motion in FLSA cases. *See, e.g., Pendlebury v. Starbucks Coffee Co.*, No. 04-CV-80521, 2005 WL 84500, at *4 (S.D. Fla. Jan. 3, 2005) (granting plaintiffs' motion to permit court-supervised notification under § 216(b) and denying defendant's motion for summary judgment without prejudice as premature). Although the Eleventh Circuit in *Hipp* generally outlined the two-tiered approach to certification under § 216(b), it also noted that "nothing in our circuit precedent, however, *requires* district courts to utilize this approach." *Hipp*, 252 F.3d at 1219 (emphasis added). The Eleventh Circuit, in adopting the two-tiered approach, relied on the rationale that there is "minimal evidence" at the notice stage in typical FLSA cases. *See id.* at 1218. Due to this "minimal evidence" – usually only consisting of the pleadings and any affidavits which have been submitted – a district court should use a "fairly lenient standard" in determining whether notice of the action should be given to potential class members. Once notice under § 216(b) is permitted, the district court may then decertify the class during the second stage, when it usually has "much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Id.*

This case, however, is in a very different posture than that envisioned in *Hipp* at the notice stage. Unlike the typical case in which district courts apply the two-tiered approach, some discovery has already proceeded in this case. For example, the depositions of Ms. Miranda and Mr. Russell have been taken, and Blockbuster relies in part on that testimony in support of its motions for summary judgment. *See* Appendix of Plaintiffs' and Opt-In Plaintiffs' Deposition Testimony [D.E. 47]. The depositions of Ms. Perdue and opt-in plaintiffs Katherine Corthon and Diana Studebaker have also been taken, and Blockbuster has submitted excerpts of those depositions in its response to the plaintiffs' motion for conditional class certification. *See id.* At this point in the litigation,

6

therefore, I have more than mere "minimal evidence" with which to make a factual determination of whether the plaintiffs are exempt under the FLSA, and whether there may be other "similarly situated" opt-in plaintiffs.   Thus the rationale in employing the two-tiered approach in *Hipp* disappears once sufficient discovery has been conducted, providing the court with more information regarding the nature of the plaintiffs' claims.  Whereas *Hipp* envisioned that such information from discovery would exist at the second stage, I find that enough discovery has been conducted at this stage for the court to make a determination whether the plaintiffs' FLSA claims may proceed further. It is also important to note that Blockbuster's summary judgment motion as to Ms. Miranda accepts most, if not all, of Ms. Miranda's testimony.  This is an additional reason to consider the summary judgment motions before addressing conditional class certification.

Furthermore, despite the plaintiffs' contention that the court is mandated by the "fairly lenient standard" under *Hipp* to allow notice under § 216(b), a district court does not mechanically apply that standard and allow further notice without an examination of the evidence.   For example, although the district court in *Mike v. Safeco Ins. Co. of America*, 274 F.Supp.2d 216 (D. Conn. 2003), applied the two-tiered approach articulated in *Hipp*, it denied the plaintiff's motion to proceed as a collective action.   The district court denied conditional certification because the putative plaintiff, along with any other potential plaintiff, would have to "present specific evidence of his or her daily tasks" for the court to determine on an individual basis whether each plaintiff had exempt status under the FLSA.  *Id.* at 220-21.  Because the nature of the putative plaintiff's claim involved a fact-intensive determination of whether he was exempt under the FLSA, the district court declined proceeding with the case on a collective basis as it would be impossible for the court to resolve the claims of so many plaintiffs at the same time.  *See id.* at 221.

Similarly, the district court in *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1271-72 (M.D. Ala. 2004), analyzed whether the plaintiffs were similarly situated by examining "the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt." 333 F.Supp.2d at 1271-72.  After considering deposition testimony and declarations submitted by the defendant, the district court determined that all of the plaintiffs employed as store managers or assistant managers by Rite Aid were not similarly situated, and the court declined to conditionally certify a collective action.

7

When discovery has been conducted at the notice stage, courts have also departed from *Hipp's* two-tiered approach and proceeded to examine the plaintiffs' claims more closely. Take *Davis v. Charoen Pokphand (USA), Inc.*, 303 F.Supp.2d 1272 (M.D. Ala. 2004), which departed from *Hipp's* "fairly lenient standard" at the notice stage and instead adopted a "more rigorous standard" because the plaintiffs had conducted discovery with respect to the defendant's policies and procedures. *Id.* at 1276. The district court considered the deposition testimony of the putative plaintiff and found that the plaintiffs did not show that other plaintiffs existed who desired to opt-in. *See id.* at 1277. Accordingly, the district court denied conditional certification under § 216(b).

These cases demonstrate that the issues and procedure related to an opt-in class under § 216(b) remains soundly within the discretion of the district court. *See also Hipp*, 252 F.3d at 1219 (citation omitted). Accordingly, I conclude that to certify a collective action and allow notice to potential plaintiffs at this point in the case without first considering Blockbuster's motions for summary judgment -- where important discovery has been conducted -- would not achieve "the economy of scale envisioned by the FLSA collective action procedure." *Holt*, 333 F.Supp.2d at 1275 (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). As Blockbuster argues, if the court found that Ms. Miranda or Mr. Russell, the lead plaintiffs, were properly classified as exempt employees under the FLSA, then any potentially similarly situated employees would also be (or might also be) exempt under the FLSA, and there would be no need to proceed as a collective action with Ms. Miranda or Mr. Russell as the putative plaintiff. If Blockbuster's motions for summary judgment were granted after certification of the collective action, the parties and the court would have unnecessarily expended time and resources to provide notice to thousands of potential class members -- consisting of past and present Blockbuster store managers and assistant managers -- only to have that class decertified at summary judgment. At this stage, discovery has been conducted on the plaintiffs' job responsibilities, and Blockbuster has filed motions of summary judgment based in part on that discovery. Therefore, the interests of judicial economy preclude this case from proceeding on a collective basis at this point.

8

## II. CONCLUSION

Accordingly, Blockbuster's motion to strike certain paragraphs in the plaintiffs' declarations submitted in support of the motion for conditional class certification [D.E. 46] is DENIED. The plaintiffs' motion for conditional class certification and to facilitate notice to absent class members under 29 U.S.C. § 216(b) [D.E. 16] is DENIED WITHOUT PREJUDICE. If Blockbuster's motions for summary judgment [D.E. 43, 66] are subsequently denied, the plaintiffs may reactivate their motion for conditional class certification and to facilitate notice to absent class members.

DONE and ORDERED in chambers in Miami, Florida, this 1st day of March, 2005.

_____

Adalberto Jordan
United States District Judge

Copy to:    Magistrate Judge Brown
            All counsel of record

9

# EXHIBIT "3"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES SEWARD, Individually, and on Behalf of
All Others Similarly Situated,

                              Plaintiff,
              - against -

INTERNATIONAL BUSINESS MACHINES
CORPORATION D/B/A IBM CORP.,

                              Defendant.

08 Civ. 3976 (VB) (PED)

**REPORT AND
RECOMMENDATION**

TO:   THE HONORABLE VINCENT L. BRICCETTI,
      UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This case involves a claim by Plaintiff Charles Seward against International Business Machines Corporation ("IBM") for unpaid overtime wages under the Fair Labor Standards Act ("FLSA").  Seward, who worked as a call center representative ("CCR") at IBM's Riveredge facility in Georgia, alleges that he was not compensated for work that he was required to perform before the start of his shifts.

Seward seeks to proceed with his claim as a collective action, on behalf of himself and other similarly situated CCRs who also worked in IBM's Riveredge facility and who, according to Seward, also had the primary job duty of fielding incoming telephone calls.  Seward's central allegation is that IBM required CCRs to report to work prior to the start of their shifts to perform tasks—specifically, "booting up" their computers—off the clock in order to be "call ready" at the start of their shifts.  He claims that he is similarly situated to other CCRs because they performed similar job duties, were subject to a uniform requirement that they work off the clock prior to the start of their shifts, and were paid by IBM only for their scheduled hours.  See

generally Docket No. 146 (Friedman Decl.), Ex. A (Amended Complaint). IBM denies all of

these allegations. See generally Docket No. 41 (Answer to Amended Complaint).

On July 21, 2009, this Court (Karas, J.) granted Seward's motion for conditional

certification to proceed as a collective action under the FLSA, 29 U.S.C. § 216(b), permitting

Seward to send notice of his lawsuit to other CCRs who are or were employed by IBM at the

Riveredge facility within three years prior to the date of the notice. See Docket No. 73.

There are currently thirty-nine opt-in plaintiffs in this case, in addition to Seward. See,

e.g., Docket No. 147 (Ray Decl.) at ¶ 7. IBM now moves for decertification of this collective

action.

This Motion comes before me pursuant to an Order of Reference dated October 4, 2011.

See Docket No. 162.

This Court heard oral argument on the Motion on December 13, 2011.

For the reasons set forth below, I respectfully recommend that this Motion be

GRANTED.

## II. BACKGROUND

### A.    Plaintiff's Motion for Conditional Certification

On February 16, 2009, Seward moved for conditional certification to proceed as a

collective action under the FLSA, 29 U.S.C. § 216(b), see Docket No. 44 (Plaintiff's Motion for

Conditional Certification), which requires the plaintiff to make a "modest factual showing" that

he and others in the proposed class are similarly situated. See Myers v. Hertz Corp., 624 F.3d

537, 554-55 (2d Cir. 2010) (internal quotations omitted); Iglesias-Mendoza v. La Belle Farm,

Inc., 239 F.R.D. 363, 367-68 (S.D.N.Y. 2007). If the court grants this motion, then the plaintiff

is permitted to mail notice to the proposed class members to inform them of their right to "opt

in" to the class. See Myers, 624 F.3d at 555; Iglesias-Mendoza, 239 F.R.D. at 367. The plaintiff's burden of proof at the notice stage of certification is "fairly lenient." See Iglesias-Mendoza, 239 F.R.D. at 367 (internal quotations omitted).

Seward argued in his certification motion that he and other CCRs who worked in IBM's Riveredge facility were similarly situated because they shared the same primary job duty—answering inbound telephone calls from IBM's customers—and were subject to a common management policy requiring them to work pre-shift boot-up time. See Docket No. 45 (Plaintiff's Memorandum of Law in Support of Motion for Conditional Certification) at 4–9. In opposition, IBM argued that there was no uniform policy or practice of managers requiring CCRs in the Riveredge facility to boot up their computers before the start of their shifts. See Docket No. 47 (Defendant's Memorandum of Law in Opposition to Motion for Conditional Certification) at 11–14.

On July 21, 2009, this Court granted Seward's motion for conditional certification, permitting Seward to send notice to other CCRs employed by IBM at the Riveredge facility. See Docket No. 73. On the record, Judge Karas noted that Seward had "barely, and I want to underscore that, satisfied the minimum burden of showing that he is similarly situated to the proposed class members." See Friedman Decl., Ex. B (Excerpt from Transcript of July 21, 2009 Hearing) at 32:1–3. He further found that the manager declarations that IBM had submitted were "very compelling," particularly with regard to demonstrating different, team-dependent expectations and requirements. Id. at 35:11–16. Judge Karas noted that, "[i]f the record doesn't change substantially, . . . [the] plaintiffs are going to have a hard time in the second stage" of the certification process. Id. at 40:3–5.

**B.    Defendant's Motion for Decertification**

3

Following Judge Karas's ruling, a court-approved notice was sent to 663 current or former CCRs from the Riveredge facility. See Ray Decl. at ¶ 5. As noted above, there are currently thirty-nine opt-in plaintiffs in the case, in addition to Seward. See id. at ¶ 7. After deposing twenty-seven of the opt-in plaintiffs, and obtaining written discovery from all of them, see Docket No. 163 (Plaintiff's Memorandum of Law in Opposition to Motion for Decertification ("Opp.")) at 3, IBM now moves to decertify the conditionally certified class.

IBM argues, as it did at the conditional certification stage, that Seward is not similarly situated to the opt-in plaintiffs because there was no uniform requirement that CCRs begin working prior to the start of their shifts or be call ready when their shifts began. See Docket No. 145 (Defendant's Memorandum of Law in Support of Motion for Decertification ("Mot.")) at 1, 5. IBM claims that the plaintiffs worked on several different teams and for several different managers, many of whom had no expectation that CCRs arrive early, given the functions or structures of their teams or the specific job duties of particular plaintiffs. See id. at 5. IBM also argues that its defenses are highly individualized and cannot be resolved collectively. See id. at 5–6. In light of these dissimilarities and individualized issues, IBM contends that it would be unfair and prejudicial to all parties to allow this action to proceed collectively. See id. at 6.

In response, Seward argues that he is similarly situated to the opt-in plaintiffs since they all performed similar job duties, worked in the same facility, were subject to the same "policies, practices, and procedures," and all have performed similar tasks off the clock. See Opp. at 5–6, 8, 10. Seward also claims that IBM's proposed defenses can be tried on a collective basis, that proceeding as a collective action comports with the remedial purposes of the FLSA, and that the Court has "procedural tools at its disposal," including the use of representative testimony and bifurcation, to make a collective trial manageable. See id. at 13, 23.

4

C.   **Pertinent Facts in the Record**

    1.   <u>IBM's Timekeeping System and Formal Overtime Compensation Policies</u>

        IBM uses "eTotals," formerly known as "Totals," as its timekeeping system for hourly, non-exempt employees, including Seward and the opt-in plaintiffs. See Docket No. 156 (Boniche Decl.) at ¶¶ 3, 7, 11. The data entered into eTotals is used to generate payroll for these employees. See id. at ¶ 8. The eTotals system defaults to an employee's scheduled hours. See id. at ¶ 3. However, employees have the ability to manually enter any overtime worked. See id. at ¶¶ 5–6. After overtime has been entered by an employee, the employee's manager will be notified of this "exception" and can either approve or disapprove of the overtime. See, e.g., Docket No. 164 (Langeland Decl.), Ex. AA (Cerny Depo.) at 72:4–11, 72:20–23 (noting that "overtime is management approved" but that employee entered overtime into eTotals herself); id., Ex. C (Coy Depo.) at 35:3–7 (noting that, if CCRs were coming in early and logging overtime, then, as a manager, he would have seen exceptions in eTotals for that). Various opt-in plaintiffs testified that they were aware of, knew how to use, and had in fact used eTotals to report overtime in the past. See Friedman Decl., Ex. K (Garrett Depo.) at 27:15–28:5; id., Ex. N (Liles Depo.) at 27:5–8; id., Ex. S (Preddy Depo.) at 35:4–25; id., Ex. V (Scott Depo.) at 58:19–25; id., Ex. W (Seward Depo.) at 252:6–17; id., Ex. X (Starkey Depo.) at 71:5–72:3.

        There appears to be no dispute that IBM's formal employment policies require that employees be compensated for overtime work, including for time spent logging into computers before the start of their shifts. See Friedman Decl., Ex. W (Seward Depo., Exs. 1 (offer letter), 27 (employment policy), 28 (employment policy)); Docket No. 48 (Ex. to Ray. Decl. in Opposition to Plaintiff's Motion for Conditional Certification (Seward Depo., Ex. 32 at 7–8 (training materials))); see also Friedman Decl., Ex. S (Preddy Depo.) at 41:13–42:23 (noting that

he had been told by managers, in the context of post-shift overtime, that IBM's company policy was to compensate employees for all time worked); Langeland Decl., Ex. O (Reidy Depo.) at 61:5–21 (noting that IBM's business conduct guidelines inform hourly employees that they are required to report overtime accurately). Additionally, IBM's managers apparently receive training regarding IBM's policy to compensate for "common" tasks, such as where an "employee arrives early and starts working" or "logs on to a computer before start of shift." See Docket No. 45, Attachment No. 28 (Ex. 15 to Plaintiff's Motion for Conditional Certification (PowerPoint slide)). Finally, several IBM managers acknowledged that they consider booting up computers and logging into various tools to be compensable work. See Langeland Decl., Ex. C (Coy Depo.) at 36:18–37:3; Docket No. 150 (Cerny Decl.) at ¶ 11; Docket No. 152 (Waters Decl.) at ¶ 8; Docket No. 153 (Starratt Decl.) at ¶ 13; Docket No. 154 (MacDonald Decl.) at ¶ 11; Docket No. 155 (Musgrove Decl.) at ¶ 17; Langeland Decl., Ex. P (Musgrove Depo.) at 65:11–66:11; Docket No. 166 (Friedman Reply Decl., Ex. H (Reidy Depo.)) at 58:17–59:7. Some managers also stated that they have directed the CCRs on their teams to report pre-shift overtime on occasion when they have observed those CCRs performing such work. See Langeland Decl., Ex. AA (Cerny Depo.) at 69:24–73:17; Cerny Decl. at ¶¶ 14–15; MacDonald Decl. at ¶¶ 12–13; Friedman Decl., Ex. AA (J. Williams Depo.) at 191:13–192:6.

2.     Functions of Various CCR Teams and Duties of Individual Opt-In Plaintiffs

As IBM argues in its Motion, the CCR teams in IBM's Riveredge facility had different purposes, functions, and shift structures, which may have affected the need to be call ready at the start of CCRs' shifts. See Mot. at 8–12. While Seward does not directly respond to this issue, he emphasizes that all of the plaintiffs worked on resolving customer service issues, often by telephone, and that they all worked in the same call center and had similar duties. See Opp. at

5–8. However, even former IBM manager Jeff Granger, who is one of Seward's key witnesses,

acknowledged at his deposition that "some . . . groups had different functions" and that CCRs'

job duties may have "varied, depending on function." See Langeland Decl., Ex. B (Granger

Depo.) at 127:6–23. Additionally, when asked whether the CCRs in IBM's Riveredge and

Dallas facilities were performing "essentially the same job duties," Granger said that "[m]ost

were doing the same functions," but noted that there were some "one-off[]" teams, including

PartnerWorld,[1] which had "some other things going on." See Langeland Decl., Ex. B (Granger

Depo.) at 36:15–37:11.

　　　While it appears that the duties of all opt-in plaintiffs involved, or at least could have

involved, some telephone work, only some opt-in plaintiffs, like Seward, were regularly and

primarily responsible for fielding incoming telephone calls.[2] See Friedman Decl., Ex. AA (J.

---

[1] PartnerWorld was managed by Wendi Kowren Musgrove, who stated in her declaration that only a few CCRs on this team were responsible for incoming calls, while all other CCRs on the team worked primarily in e-mail, under a 48-hour turnaround requirement, and occasionally made outgoing calls. See Musgrove Decl. at ¶¶ 3–4. On "rare" occasions, these CCRs might provide back-up to those few CCRs on the team who were responsible for fielding incoming calls. See id. at ¶ 3. Five opt-in plaintiffs apparently worked on this team, none of whom worked primarily on fielding incoming calls. See id. at ¶¶ 9–12; see also Langeland Decl., Ex. D (e-mail dated April 18, 2011 from Matthew W. Ray to Erik Langeland listing all plaintiffs and the managers to whom they reported). This Court notes that the e-mail set forth in Langeland Decl., Ex. D appears to be the most concise and authoritative document in the record regarding the managerial assignments of the opt-in plaintiffs. At oral argument, however, Seward's counsel noted that this e-mail is incomplete. See Transcript of December 13, 2011 Hearing at 34:1–11. Based upon this Court's review of the record, this representation appears to be accurate. For example, it appears that Opt-In Plaintiff Reginald McArthur is not included in Langeland Decl., Ex. D, although he continues to be a plaintiff in this case. See Docket No. 98 (McArthur's Consent to Join Collective Action). On the other hand, this e-mail is somewhat over-inclusive because, as Seward notes in his opposition, it lists two plaintiffs, Charletta Bohler and David Ohmann, who have since voluntarily dismissed their claims. See Opp. at 2 n.6; see also Docket Nos. 131, 142 (stipulations of voluntary dismissal for Bohler and Ohmann, respectively)

[2] IBM conceded at oral argument that approximately half of the opt-in plaintiffs regularly fielded incoming telephone calls at the start of their shifts. See Transcript of December 13, 2011

Williams Depo.) at 189:21–190:21 (discussing time at which Seward began "actively . . . taking calls" as a member of her team"), 192:12–21 (discussing her review of reports to ensure that her teams were meeting "service levels" for their calls"); Docket No. 151 (Betterson Decl.) at ¶¶ 2–3 (noting that CCRs on one of her teams spent majority of their time handling incoming calls); Starratt Decl. at ¶¶ 3–4 (noting that CCRs on his teams spent majority of their time handling incoming calls); Docket No. 158 (Davis Decl.) at ¶ 2 (noting that CCRs on her teams handled incoming calls); Docket No. 159 (Torres Decl.) at ¶ 5 (noting that CCRs on some of her teams primarily handled incoming calls). One team whose primary duty was to field incoming telephone calls was the System X team, which was managed by George Lambousis, Juanita Carver, Steven Coy, and Vicky Reidy, among others. See Docket No. 157 (Lambousis Decl.) at ¶ 3; Langeland Decl., Ex. E (Lambousis Depo.) at 65:2–11; Langeland Decl., Ex. C (Coy Depo.) at 16:11–18:4.

However, other opt-in plaintiffs worked primarily on preparing reports or communicating with customers via e-mail or outbound telephone calls and were not subject to immediate turnaround requirements. For example, IBM manager Rick Odle testified that incoming calls represented a "very small percentage of [his team's] total call volume" and that most of his team's telephone work involved returning calls within a certain time frame. See Langeland Decl., Ex. S (Odle Depo.) at 41:4–43:8. Other IBM managers similarly noted that the CCRs on their teams, including several opt-ins, were not regularly responsible for fielding incoming calls. See Betterson Decl. at ¶ 3 (noting that the "majority of calls handled by [one of her teams] are outgoing"); Musgrove Decl. at ¶¶ 3–5, 7, 9–10, 12 (noting that most CCRs on her team worked primarily in e-mail or on the internet, though "a few CCRs" on her team, apparently none of

_____

Hearing at 5:15–22.

whom are opt-ins in this case, handled live, incoming calls); Cerny Decl. at ¶¶ 3–4 (noting that CCRs on her team "spent roughly 90 percent of their time researching and performing non-phone work and 10 percent of their time on phone calls"); Waters Decl. at ¶¶ 2–3, 5 (noting that, until October 2010, CCRs on his team spent eighty-five to ninety percent of their time making outgoing calls and ten to fifteen percent of their time handling live, incoming calls and that currently they spend seventy-five to eighty percent of their time making outgoing calls and twenty to twenty-five percent of their time handling incoming calls); Torres Decl. at ¶¶ 5–6 (noting that CCRs on one of her teams spend the "vast majority" of their time returning calls that have been gathered in a queue); MacDonald Decl. at ¶¶ 2–6 (noting that, while some CCRs on his team mostly handled incoming calls, other CCRs mostly handled outgoing calls).

 Additionally, some opt-in plaintiffs themselves have acknowledged during discovery that they did not regularly field incoming telephone calls. See Friedman Decl., Ex. C (M. Armour Depo.) at 15:13–16:9 (noting that she did not work on incoming telephone calls and that her job duties primarily involved research and some outgoing calls), 21:24–22:16 (agreeing that she determined in her "discretion" when to make outgoing calls); id., Ex. Z (B. Williams Depo.) at 18:7–20:25 (describing her duties on the Pended QSAR team and noting that this work involved exchanging e-mails and instant messages, as well as some telephone calls, with technicians); id. Ex. S (Preddy Depo.) at 21:8–22:8 (noting that he only answered general incoming calls if there was a backlog and that he worked mostly with e-mail and occasional outgoing or incoming calls).

 Even for teams on which some or all CCRs were regularly responsible for fielding incoming calls, several managers organized their teams' schedules into staggered, overlapping shifts so that there would always be phone coverage, even at the start of a particular CCR's shift.

See Friedman Decl., Ex. T (Raker Depo.) at 88:5–11; Cerny Decl. at ¶ 7; Betterson Decl. at ¶ 4; Waters Decl. at ¶ 4; MacDonald Decl. at ¶ 8; Musgrove Decl. at ¶ 8; Davis Decl. at ¶ 5; Torres Decl. at ¶ 7; Starratt Decl. at ¶ 4–5 (also noting that, before the first scheduled employee of the day arrived, a sister team at IBM's call center in Dallas would cover any incoming calls). For example, one opt-in's shift was scheduled to start an hour before the telephone lines were even open. See Friedman Decl., Ex. M (Landery Depo.) at 48:16–49:24 (noting that Opt-In Plaintiff John Gibson's shift started at 7 a.m. and that Gibson handled paperwork for that first hour until the telephone lines opened at 8 a.m.); Musgrove Decl. at ¶ 11 (noting same and that there was no need for Gibson to be call ready at the start of his shift).

      3.    Requirements and Expectations of Individual IBM Managers

In light of these varying functions and duties, IBM also notes that expectations and practices of individual IBM managers varied from team to team and that there was no uniform expectation that CCRs perform work to make themselves call ready before the start of their scheduled shifts. See Mot. at 8–12.

Some managers apparently did expect the CCRs on their teams, including some plaintiffs, to report to work pre-shift to boot up their computers and otherwise make themselves call ready. For example, Seward has presented evidence to show that the managers of the System X team, a predominantly incoming call team, expected the CCRs on their team to engage in such pre-shift work.[3] In a 2005 e-mail, IBM manager George Lambousis informed members

---

[3] Seward apparently did not work on the System X team, see, e.g., Transcript of December 13, 2011 Hearing at 22:7–24:5, although it appears based on managerial assignments that nine of the opt-in plaintiffs may have. See Langeland Decl., Ex. D.

of the System X team, including six opt-in plaintiffs,[4] that his "policy" and "expectation" for the

CCRs on that team was that "your workstation is powered up, you are logged on to the necessary

applications, and you are in an available state on your phone at your start time." Langeland

Decl., Ex. DD.

  Lambousis confirmed at his deposition that this was his expectation for the CCRs on his

team given that his "team is a predominantly live call team," though he stated in his declaration

that this e-mail only "advised that [he] expected System X CCRs to power up their work

stations, log into necessary applications, and be ready to handle phone calls *at the start* of their

scheduled shifts." Langeland Decl., Ex. E (Lambousis Depo.) at 54:3–15, 65:2–11; Lambousis

Decl. at ¶ 4 (emphasis added).  Lambousis also explained that he sent this e-mail as a

clarification to CCRs who had recently transferred to System X from other teams that did not

have an expectation that they be "available to take calls, booted up, ready to go at [their] start

time." See Friedman Decl., Ex. L (Lambousis Depo.) at 64:4–17; Lambousis Decl. at ¶ 5.  There

is no indication that Lambousis's requirement extended to teams other than System X.  See

Lambousis Decl. at ¶ 6 (stating that he sent his e-mail "only to System X CCRs" and that he had

"no managerial or supervisory responsibility for any teams other than System X"); Cerny Decl.

at ¶ 20 (noting that Lambousis had no "role with respect to" her teams); Betterson Decl. at ¶ 13

(same); Waters Decl. at ¶ 14 (same); Starratt Decl. at ¶ 17 (same); MacDonald Decl. at ¶ 19

(same); Musgrove Decl. at ¶ 21 (same); Davis Decl. at ¶ 13 (same); Torres Decl. at ¶ 15 (same).

  The testimony of other System X managers suggests that they also may have expected

the CCRs who reported to them to boot up pre-shift in order to be call ready at the start of their

---

  [4] The recipients of the Lambousis e-mail include the following opt-in plaintiffs: Harry
Flair, James Starkey, Raymond Liles, Thomas Poehnelt, Walter Hendrix, and Ralph Wayne
Faircloth.  See Langeland Decl., Ex DD; see also id., Ex. D (listing opt-in plaintiffs).

shifts. See Langeland Decl., Ex. C (Coy Depo.) at 16:11–18:4 (listing System X managers, including Vicky Reidy, George Lambousis, and Juanita Carver, in addition to himself); Ex. DD (copying Reidy and Carver on e-mail sent to System X CCRs).  For example, System X Manager Steven Coy, to whom five opt-ins apparently reported, see Langeland Decl. Ex. D, said that he expected CCRs on his team to be "ready to roll or ready to take your phone calls and do your job at your scheduled time" and that this required them to "come in before [their] designated start time[s] in order to boot [their] system[s] up." See Langeland Decl., Ex. C (Coy Depo.) at 24:17–25:6, 26:14–21.  Another System X manager, Juanita Carver, testified that she "preferred that the agents are powered up at their start time . . . [and] ready to take a call," which would involve booting up their computers and launching applications, but noted that she was speaking only for "[her] department."[5] See Langeland Decl., Ex. F (Carver Depo.) at 94:5–15, 116:4–14; but see Friedman Decl., Ex. G (Carver Depo.) at 117:2–119:14 (stating that an employee who arrived exactly at start of shift but logged into telephone system and turned computer on immediately would be considered on time).

Outside of the System X team, the testimony of some other IBM managers suggests that they also expected the CCRs on their teams to begin working prior to the start of their scheduled shifts to ensure they were ready to log in to the telephone system and begin taking calls immediately. One of Seward's managers, Juanlyn Williams, stated at her deposition that, in order to be "successful," she expected that the CCRs on her team[6] would make themselves available to take calls only after "their computer and tools [were] fully up." Langeland Decl.,

---

[5] Seven opt-in plaintiffs apparently reported to Carver. See Langeland Decl., Ex. D.

[6] Williams also apparently supervised two opt-in plaintiffs. See Friedman Decl., Ex. C (M. Armour Depo.) at 22:23–24; Friedman Decl., Ex. V (Scott Depo.) at 58:1–17.

Ex. Q (J. Williams Depo.) at 117:13–18.[7]  Another manager, Michael Landery, testified that

some CCRs on his team[8] may have engaged in pre-shift work, but noted that, to the extent they

did so, they should have reported it in eTotals and he would have approved it.[9]  See Langeland

Decl., Ex. BB (Landery Depo.) at 92:6–93:23 (also noting that, when overtime was reported, he

approved it "a lot").

     Seward relies heavily on the testimony of one former IBM manager, Jeff Granger, in

support of his claim that all CCRs in the Riveredge facility were subject to a uniform

requirement that they perform pre-shift work.  Granger was a "second-line" IBM manager[10] and,

in that capacity, he supervised several "first-line" managers who, in turn, supervised some opt-in

plaintiffs.[11]  Granger testified that IBM's predictions of how much staff it needed on a particular

team were based on that team's productivity level, and that productivity levels were premised on

CCRs being call ready at the start of their shifts and, therefore, booting up their computers and

---

   [7]  Williams also testified, however, that she considered the CCRs on her team to be on
time as long as they logged in to the telephone system at the scheduled start of their shifts, even
if they had to boot up their computers after that.  See Friedman Decl., Ex. AA (J. Williams
Depo.) at 188:12–189:13.

   [8]  Five opt-in plaintiffs apparently worked for Landery.  See Langeland Decl., Ex. D.

   [9]  This Court was unable to locate specific testimony by Landery regarding whether he
actually required or expected his CCRs to engage in such pre-shift work.

   [10]  CCRs report directly to "first-line" managers.  In turn, first-line managers report to
second-line managers.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 22:10–25,
24:9–25:19; see also Opp. at 2.

   [11]  Granger apparently supervised nine first-line managers.  See Friedman Reply Decl.,
Ex. D (Granger Depo.) at 22:15–25, 78:15–79:5.  It appears that thirteen opt-in plaintiffs were
supervised by first-line managers who reported to Granger.  See Langeland Decl., Ex. D.  As
noted below, several of these first-line managers have stated that they did not require the CCRs
on their teams to be call ready or boot up before their shifts, including Sara Cerny, Roseanne
Davis, Mike Landery, Wendi Kowren Musgrove, Pete Starratt, Viki Torres, and Juanlyn
Williams.

launching applications before their shifts started. See Langeland Decl., Ex. B (Granger Depo.) at 20:3–21. Granger also stated that it "became the practice" or was "highly encouraged" for CCRs to "come in early to boot up their computers and launch their programs before their designated start times." Id. at 28:25–30:8. He denied that this practice was instituted by some "rogue manager" and agreed that "this was simply the practice followed at the call center in River Edge [sic]." Id. at 131:18–132:4.

Granger claimed that this practice "came from above," "remained in force and effect throughout the time that [he was] at IBM," and that CCRs "were directed to" comply. See id. at 30:19–20, 31:2–32:11. Specifically, he testified that this expectation came from former "director of the call center," Tim Allaway, who, according to Granger, never specifically directed CCRs to report to work early to boot up their computers but who "expected" or "highly encouraged" CCRs to do so. See Friedman Reply Decl., Ex. D (Granger Depo.) at 27:3–29:21. As IBM emphasizes, however, Granger testified that Allaway was one of his managers only until approximately 2002, several years before the three-year "class period" relevant for this case began. See id. at 54:6–21, 55:22–57:8; Docket No. 165 (Defendant's Reply Memorandum in Support of Motion for Decertification ("Reply")) at 3. Furthermore, Granger noted that he did not recall any of the managers to whom he reported after 2005 ever indicating that they expected CCRs to be call ready by the start of their scheduled shifts. See Friedman Reply Decl., Ex. D (Granger Depo.) at 68:19–78:7; see also Reply at 3. Granger also said that he was unaware of any written documentation regarding when CCRs should arrive to work or be call ready. See Friedman Reply Decl., Ex. D (Granger Depo.) at 70:16–24.

Granger testified that, as a second-line manager, he supervised nine different first-line managers. See Friedman Reply Decl., Ex. D (Granger Depo.) at 22:15–25 (listing names of

14

first-line managers whom he supervised).  At his deposition, Granger described meetings that he

had with two of those first-line managers, Pete Starratt and Viki Torres, and the CCRs on their

teams[12] regarding his expectation that they report early to make themselves call ready before the

start of their shifts in order to enhance their productivity.  See Langeland Decl., Ex. B (Granger

Depo.) at 37:22–39:24; Friedman Reply Decl., Ex. D (Granger Depo.) at 89:9–90:4, 91:9–93:10,

107:13–108:10.  Granger further testified that, although these were the only specific meetings or

discussions he recalled having with any of his first-line managers or CCRs, he believed that all

of his first-line managers followed this practice; however, he acknowledged that he did not

follow up with any of them to ensure that this was the case.  See Langeland Decl., Ex. B

(Granger Depo.) at 29:14–30:14, 39:12–40:5; Friedman Reply Decl., Ex. D (Granger Depo.) at

108:11–109:5, 124:17–125:24.  Granger also was careful to note that he did not instruct

CCRs—during the meetings discussed above or at any other time—to not report this pre-shift

overtime in eTotals.  See Friedman Reply Decl., Ex. D (Granger Depo.) at 90:5–25.

　　　While Granger said that it was his "understanding" that all CCRs in the Riveredge

facility were reporting early to boot up and make themselves call ready, he noted that the first-

line managers who reported to him and the CCRs on their teams would have the best knowledge

about whether there was a call-ready expectation on those particular teams and, if so, whether

CCRs recorded pre-shift time that they had worked in order to comply with this expectation.[13]

See id. at 91:2–8, 93:15–18, 102:24–103:20.  Granger also confirmed that he did not even know

---

[12] It appears that seven opt-in plaintiffs reported to either Starratt or Torres and therefore
may have been present at these meetings.  See Langeland Decl., Ex. D.

[13] Opt-in Plaintiff Herbert Miller testified that, as "second-line manager," Granger "didn't
get down to the nuts and bolts," but rather left details "to the first-line manager" and that
Granger never told Miller that he needed to come in early.  See Friedman Reply Decl., Ex. C
(Miller Depo.) at 76:15–17, 78:6–11.

what another second-line manager who worked on his floor, Sharon Lofton, may have required for her teams.[14] See Langeland Decl., Ex. B (Granger Depo.) at 51:7–22; Friedman Reply Decl., Ex. D (Granger Depo.) at 113:19–114:7. In fact, at her deposition, Lofton testified that her "policy is that you're supposed to be at work during your scheduled work time[, so,] [i]f you're scheduled at 8 o'clock, I expect for you to be at your desk at 8 o'clock." See Friedman Reply Decl., Ex. E (Lofton Depo.) at 109:23–112:1 (also noting that she "expect[ed] for the agent at 8 o'clock to sit down and follow whatever process it is to get them prepared to do their job" and that she had no expectation as to whether CCRs logged into the telephone system or booted up their computers first). Lofton also stated that she expected CCRs to report any overtime that they worked in eTotals. See id. at 109:6–14.

In addition to the Lambousis e-mail and Granger testimony, Seward also argues that a 2006 e-mail drafted by IBM analyst Gary Kamprath and forwarded to Seward and at least one other opt-in further demonstrates that CCRs in the Riveredge facility were subject to a uniform management expectation that they arrive early to make themselves call ready before their shifts began. See Langeland Decl., Ex. EE (listing Seward and Opt-in Plaintiff Cathy Barday as recipients to whom this e-mail was forwarded); see also Langeland Decl., Ex. D. Kamprath's e-mail recommended that those CCRs who were subject to "daily operating reports," or "DORs" prepared by his team "log in, only as required (ie [sic] scheduled to work at 9:00, be ready at 8:50), but only log in at 9:00 am to ensure we are not accumulating unproductive hours." Id. Kamprath testified that he understood his e-mail to mean only that CCRs should arrive early enough to ensure that they were ready to "start[] work" at their start times by "logging into the

---

[14] Granger stated that Lofton supervised several first-line managers, including Mike Landery, Wendi Kowren Musgrove, and Juanlyn Williams. See Friedman Reply Decl., Ex. D (Granger Depo.) at 113:25–114:16.

telephone and turning on [the] computer." <u>See</u> Langeland Decl., Ex. Y (Kamprath Depo.) at 153:1–154:15.

Kamprath was not a CCR manager; rather, he was a member of IBM's Workforce Management team who prepared DORs to assess the productivity of those CCR teams "who spend the majority of their time on the phone." <u>See</u> Docket No. 168 (Kamprath Decl.) at ¶¶ 2–3, 9–13; Langeland Decl., Ex. Y (Kamprath Depo.) at 25:16–29:20, 35:6–36:11. The preparation of these DORs apparently depended on the log-in/log-out data generated by the telephone system that IBM's CCRs use and are required to log into at the start of their shifts. <u>See</u> Kamprath Decl. at ¶ 8. Although CCRs on all teams seem to have been required to log into the telephone system at the start of their shifts, not all teams were primarily responsible for handling incoming telephone calls, nor were they all subject to Kamprath's DOR-related monitoring. <u>See</u> Kamprath Decl. at ¶ 3 (noting that "DOR teams are those teams with employees who spend the majority of their time on the phone . . . to assess how busy teams are when they are working the phones" and that "DORs are not provided to any other teams at the Riveredge facility," including to "any Riveredge teams on any floor other than the fifth floor");[15] Cerny Decl. at ¶ 21; Betterson Decl. at ¶ 12; Waters Decl. at ¶ 13; MacDonald Decl. at ¶ 18; Musgrove Decl. at ¶ 22.

Seward emphasizes the fact that, for productivity reasons, CCRs were not permitted to log into the telephone system until their scheduled shift time even though they were expected to report to work earlier in order to be call ready at the start of their shifts.[16] <u>See</u> Opp. at 6–7;

---

[15] According to Seward, twenty-four plaintiffs worked on the fifth floor, with thirteen of those reporting to Granger and eleven reporting to Lofton. <u>See</u> Opp. at 2.

[16] Some plaintiffs testified that, in order to be technically on time, they could have logged into the telephone system at the start of their shifts in an "AUX," or unavailable, mode until they had made themselves call ready by booting up their computers; however, they noted that their managers expected them to log into the telephone system in an "available" state so that they

Langeland Decl., Ex. G (Seward Depo.) at 86:7–87:25 (noting that, for "productivity" and "schedule adherence" reasons, CCRs were discouraged from logging into the telephone system more than a "minute or two" before the start of their shifts); see also Langeland Decl., Ex. I (Starkey Depo.) at 52:8–53:25. However, the telephone log-in data had no effect on payroll. See Boniche Decl. at ¶ 9; see also Cerny Decl. at ¶ 18; Starratt Decl. at ¶ 15; Musgrove Decl. at ¶ 19; Davis Decl. at ¶ 10; Torres Decl. at ¶ 12. As noted above, payroll was determined solely on the basis of eTotals. See Boniche Decl. at ¶ 9. Therefore, management requirements regarding the exact timing of CCRs' telephone log-ins does not seem relevant to Seward's claims. Even so, Seward argues that Kamprath's e-mail is reflective of management's expectation that CCRs "be ready" prior to their scheduled start time. See Opp. at 9–10. However, any expectation reflected by Kamprath's e-mail seems relevant only to those plaintiffs who worked on teams subject to DOR reporting, and even as to those plaintiffs, the persuasiveness of this e-mail is limited, given that Kamprath did not have supervisory authority over any CCRs. See Kamprath Decl. at ¶ 12.

In contrast to the evidence regarding managerial expectations regarding pre-shift work presented by Seward, IBM has presented substantial evidence demonstrating that several first-line IBM managers, including some who apparently reported to Granger, see Langeland Decl. Ex. D, did not expect or require the opt-in plaintiffs on their teams to be call ready at the start of their shifts or to engage in pre-shift boot up or other work, in light of the unique functions or

---

could begin handling call immediately and, therefore, that logging in as unavailable would not satisfy their managers' expectations. See Langeland Decl., Ex. N (Garrett Depo.) at 40:16–41:10, 41:23–42:11; id., Ex. U (Owens Depo.) at 87:20–88:10; Friedman Decl., Ex. P (Miller Depo.) at 49:25–50:12; 76:22–77:15; id., Ex. Y (Wasson Depo.) at 54:8–15. This expectation also apparently is reflected in the Lambousis e-mail, which instructed CCRs to be "in an available state on your phone at your start time." Langeland Decl., Ex. DD.

structures of their teams.[17]  As discussed above, several opt-ins either worked on teams, or in

specific positions, that were not regularly responsible for fielding incoming calls.  Additionally,

even among teams that did regularly handle incoming calls, some managers structured shifts so

that the telephone lines were always covered and CCRs did not need to make themselves call

ready before their shifts began.  Several IBM managers accordingly have stated that the opt-ins

on their teams were not subject to any requirement that they report early to begin working pre-

shift.  For example, manager Sara Cerny stated that it was "not [her] expectation" that CCRs

arrive early to begin working and that, on the occasions when she did discover CCRs doing so,

she instructed them to either record the overtime or leave early to make up for starting early and

directed them not to continue this practice.  See Langeland Decl., Ex. AA (Cerny Depo.) at

68:6–70:9; see also Cerny Decl. at ¶¶ 2–15 (describing the functions and shift structures of her

teams and explaining why pre-shift boot up was unnecessary and neither expected nor required

for those teams).  Manager Michael MacDonald noted that CCRs on his teams were not required

to log off each night so it was not even necessary for them to boot up at the start of every shift.

See MacDonald Decl. at ¶ 15; see also id. at ¶¶ 2–17 (describing the functions and shift

structures of his teams and explaining why pre-shift boot up was unnecessary and neither

expected nor required for those teams).  As noted above, second-line manager Sharon Lofton

testified that "[i]f [a CCR was] scheduled [to work] at 8 o'clock," then she "expect[ed] for [the

CCR] to be at [his] desk at 8 o'clock."  Langeland Decl., Ex. CC (Lofton Depo.) at 106:19–25,

106:3–10 (also noting that her "expectation" was that CCRs would report any overtime worked

in eTotals).  Many other managers confirmed that pre-shift boot up was neither necessary nor

---

[17] Based on the information set forth in Langeland Decl., Ex. D and other parts of the
record discussed below, it appears that twenty-seven opt-in plaintiffs worked for at least one
manager who has said that he or she did not expect or require pre-shift work.

expected for the opt-ins who worked on their teams.  See Betterson Decl. at ¶¶ 3–11; Waters

Decl. at ¶¶ 3–12; Starratt Decl. at ¶¶ 3–16; Musgrove Decl. at ¶¶ 3–20; Davis Decl. at ¶¶ 2–8;

Torres Decl. at ¶¶ 2–10; see also Langeland Decl., Ex. R (Wampler Depo.) at 140:6–13 (noting

that he had a "level of confidence that the [CCRs on his team] know to start at their start time,"

which required that they log in at their start time, but not specifically stating whether CCRs on

his team had to boot up before the start of their shifts); Friedman Reply Decl., Ex. H (Reidy[18]

Depo.) at 58:2–11 (noting that she never observed CCRs booting up pre-shift and never directed

any first-line managers who reported to her that they should require CCRs to do so).  While this

testimony arguably conflicts with Jeff Granger's testimony regarding what was expected for all

CCRs, even Granger himself acknowledged that the functions of some CCR teams, including

Musgrove's PartnerWorld team, were different from his team and that other second and first-line

managers, including the first-line managers who reported to him, would be in the best position to

know what was required or expected for the CCRs who were under their direct supervision.  See

Langeland Decl., Ex. B (Granger Depo.) at 36:15–37:11, 51:7–22, 127:6–23; Friedman Reply

Decl., Ex. D (Granger Depo.) at 102:24–103:20; 113:19–114:7.

    4.    Experiences of Individual Opt-In Plaintiffs

        Several opt-in plaintiffs who worked on various teams testified that they believed they

were required to boot up their computers pre-shift and in fact did so without receiving

compensation for it.  Named Plaintiff Seward noted that he typically arrived to work twenty to

thirty minutes before his shift and that it was "procedure" for CCRs to arrive early to boot up but

---

[18] Reidy apparently was a System X second-line manager, see Langeland Decl., Ex. C (Coy Depo.) at 16:11–21, and her testimony is somewhat inconsistent with the statements of other System X managers who acknowledged that System X CCRs were expected to boot up and make themselves call ready prior to the start of their shifts.

not to log into the telephone system until their start time. See Langeland Decl., Ex. G (Seward

Depo.) at 96:13–97:12, 148:6–150:10.  Seward also described discussions that he had with other

CCRs who were following the same practice, but said that no IBM managers ever told him that

he could report pre-shift boot-up time in eTotals. See id. at 319:12–321:8.  Opt-in Plaintiff

Cathy Barday testified that she generally arrived to work at least fifteen minutes before her start

time and that she spent this time performing tasks to make herself call ready. See id., Ex. H

(Barday Depo.) at 20:19–22:11 (stating that she had no specific goal in terms of how early she

wanted to arrive but then discussing the fifteen to twenty-minute process in which she engaged

to make herself call ready), 138:5–23 (stating that she generally arrived to work more than

fifteen minutes before start time); see also id. at 135:4–136:20 (stating that a manager instructed

her team only to report time in eTotals if he had pre-approved it).  Another opt-in plaintiff,

James Starkey, stated that, as a member of the System X team, he was subject to the call-ready

requirement described in the Lambousis e-mail and could not recall ever logging in to the

telephone system before booting up his computer or knowing of anyone else who did.  See id.,

Ex. I (Starkey Depo.) at 62:12–22, 67:9–68:2.  Opt-in Plaintiff Eugene Scott testified that his

manager, Juanlyn Williams,[19] instructed him to "be there early to . . . log the systems on before

we get onto the phone," though he acknowledged that she never told him not to report this time

in eTotals. See id., Ex. J (Scott Depo.) at 57:1–59:12; see also id. at 60:14-61:7 (noting that he

had to spend ten to fifteen minutes booting up before the start of his shift).

　　　　Many other opt-ins provided similar testimony at their depositions, indicating that they

also believed they were expected to boot up their computers before the start of their shifts or that

---

　　　　[19] As noted above, Williams was also the manager of Named Plaintiff Seward and one
other opt-in plaintiff.  See Langeland Decl., Ex. D; Friedman Decl., Ex. C (M. Armour Depo.) at
22:23–24.

they in fact did so, even if they were not sure about their managers' expectations. See Langeland Decl., Ex. K (Liles Depo.) at 49:12–52:10 (stating that he had been told by a non-manager "team lead" that he should not report time he spent booting up pre-shift in eTotals and that this was the "general attitude"); 92:9–25 (noting that "[w]ith regard to pre-shift overtime . . . management's expectation" was "[t]hat it doesn't exist"); id., Ex. L (Lee Depo.) at 67:11–68:19 (noting that she and others were instructed during training in 1998 to "arrive early to make sure everything was up and running" prior to shift start); id., Ex. N (Garrett Depo.) at 32:2–19 (noting that System X managers, including Juanita Carver, Steven Coy, and George Lambousis, "asked [him] to be there early, 20 minutes or so early, so we could have all the programs and applications that IBM used up and running prior to our start time"), 42:2–20 (noting that it was his managers' expectation and his regular practice to arrive to boot up about twenty minutes before his shift start time), 47:2–24 (stating that he did not record pre-shift boot-up time because it was an "unwritten rule" that they should not do so, though acknowledging that no managers ever specifically told him this was the case); id., Ex. T (Glanton Depo.) at 101:3–103:23 (discussing his boot-up process, explaining that when he finished this process he would wait to log into the telephone system until his scheduled start time); id., Ex. U (Owens Depo.) at 86:24–91:21 (noting that, when she arrived early, she would start working immediately although she did not report this time in eTotals because this was "just expected"); id., Ex. GG (D. Brown Depo.) at 60:19–61:25, 76:7–17 (stating that her managers, including Pete Starratt, told her to have her computer up and running so that she would be call ready at the start of her shift), 84:8–85:4, 92:2–21 (noting that Pete Starratt told her not to report pre-shift boot-up time in eTotals because it was part of her "job description"); id., Ex. HH (M. Armour Depo.) at 43:17–46:3 (noting that some, but not all, managers indicated to her that CCRs should arrive early to boot up pre-shift

22

and that she generally tried to arrive fifteen minutes before the start of her shift); Friedman

Decl., Ex. E (Bowers Depo.) at 38:14–41:19 (noting that he would arrive to work twenty to thirty

minutes before his shift to boot up because his "team lead" and other senior colleagues told him

this was expected, but acknowledging that no managers ever told him this was necessary); id.,

Ex. P (Miller Depo.) at 76:11–77:23 (stating that, although no managers specifically said so, it

was "more or less understood" that CCRs were expected to be in an available state on the

telephone system at the start of their shifts which required them to boot up their computers pre-

shift); id., Ex. R (Poehnelt Depo.) at 71:12–73:25 (noting that it took him somewhere between

ten and twenty minutes to boot up, and sometimes check e-mails and queues, prior to the start of

his shift); id., Ex. T (Raker Depo.) at 88:23–89:23 (noting that the "time window" in which

CCRs were expected to arrive was "never discussed" but that "everything was about

productivity, being available, ready to take calls, take the most calls," so it was his understanding

that he should arrive early to boot up so he would be available to take calls at the start of his

shift); id., Ex. Y (Wasson Depo.) at 59:18–60:24 (noting that he aimed to arrive at work five to

thirty minutes before his shift and would typically begin working upon arrival, although no one

asked him to do so); see also Langeland Decl., Ex. W (Seward Decl.) at ¶¶ 14–18; id., Ex. X

(Barday Decl.) at ¶¶ 14–19.

However, some opt-ins acknowledged that their managers did not actually instruct them

to arrive early to boot up or that their managers would have considered them to be on time as

long as they were at their desks and logged into their telephones at the start of their shifts, even if

they had not yet booted up their computers. See Langeland Decl., Ex. L (Lee Depo.) at 83:8–25

(noting that her managers did not communicate their expectations with regard to arrival time or

compensation for any pre-shift time that may have been worked, despite testifying earlier that

she was told during training to arrive early); Friedman Decl., Ex. K (Garrett Depo.) at 49:7–23 (noting that, while working as a contract employee, his previous employer instructed him not to report pre-shift overtime so he assumed this was IBM's requirement as well, although no one at IBM ever told him not to report pre-shift overtime); id., Ex. P (Miller Depo.) at 49:22–50:9, 70:4–71:11 (noting that most members of his team arrived right at their scheduled shift time, logged into the telephone system in an unavailable state in order to avoid being considered late, and then booted up, but also stating that he thinks these CCRs were "spoken to"), 76:11–20 (acknowledging that no managers ever told him he needed to arrive to work early); id., Ex. T (Raker Depo.) at 88:23–89:23 (acknowledging that no one actually told him how early he was expected to arrive); id., Ex. Y (Wasson Depo.) at 54:8–25 (noting that, in order to be in an available state on the telephone system by shift start as expected, he had to boot up pre-shift, but acknowledging that no manager directed him to do this).

Similarly, some opt-in plaintiffs offered testimony that was internally inconsistent, at times indicating that it was expected for them to boot up pre-shift, but later suggesting that there was no such requirement. See Langeland Decl., Ex. M (Y. Brown Depo.) at 78:8–80:21, 85:24–87:18 (stating that her managers never instructed her to arrive early to boot up and would have considered her on time as long as she was logged into the telephone system at shift start time, but then noting that she would need to boot up ten to fifteen minutes before the start of her shift in order to be ready, and then stating again that she sometimes logged into the telephone system at the start of her scheduled shift to be considered on time and began taking calls before all her systems were booted up), 91:17–93:18 (noting that she did not record pre-shift overtime because it would have been considered unauthorized since "you're arriving early at your own discretion"); id., Ex. FF (Eyoh Depo.) at 59:7–63:21 (noting that she would "not necessarily" be

24

considered late if she logged into the telephone system at her scheduled time and then booted up
her computer after the start of her shift, but that it was "company policy" and management's
expectation that CCRs be logged into their telephones and computers at the start of their shifts);
Friedman Decl., Ex. E (Bowers Depo.) at 38:14–40:22 (acknowledging that no managers ever
told him to arrive early to boot up prior to the start of his shift, but stating that he in fact did so
given his understanding from colleagues that this was expected and due to his own "professional
work ethic"); id., Ex. P (Miller Depo.) at 76:11–77:10 (noting that "nobody" told him that he
"needed to come in early every day" and that he "could have logged in at [shift start] or run to
my desk at [shift start] and hit the button to bring the system up and everything" but that he
"prefer[red] to come in a little early so I could do it relaxed without pressure and put things
together the way I like them"). Opt-in Plaintiff Yolanda Brown testified that she often booted up
her computer "tools" after she logged into the telephone system and began taking calls. See
Friedman Decl., Ex. F (Y. Brown Depo.) at 72:3–73:11 (noting that she turned her computer on
"[a]lmost simultaneously" with logging into the telephone system and that she would "take calls
while . . . [she was] booting up"). Another opt-in plaintiff, Monica Owens, conceded that her
manager did not require her to shut down her computer after every shift and therefore apparently
would not need to spend as much time booting up prior to each shift. See id., Ex. Q (Owens
Depo.) at 58:11–59:22.

    Further, while some opt-in plaintiffs maintain that they arrived early to boot up their
computers pre-shift, they have acknowledged that they did not generally handle incoming calls
at the start of their shifts which, according to IBM, undermines their claim that it was necessary
or expected by management for them to do so. See id., Ex. C (M. Armour Depo.) at 15:13–16:9
(noting that she did not work on incoming telephone calls and that her job duties primarily

involved research and some outgoing calls), 21:24–22:16 (noting that she determined in her "discretion" when to make outgoing calls); id., Ex. S (Preddy Depo.) at 21:2–22:8 (noting that he generally "wouldn't be on the phones for the general calls that came in" and that he worked mostly with e-mail and occasional outgoing or incoming calls); id., Ex. Z (B. Williams Depo.) at 18:7–20:25 (noting that her work involved exchanging e-mails and instant messages, as well as some telephone calls, with technicians).

Other opt-ins testified that they arrived early to work for personal reasons or engaged in personal activities before starting work, even though they may also have engaged in pre-shift work during that time; some managers also testified that this was their understanding of what some opt-in plaintiffs were doing on occasions when they arrived early. See Langeland Decl. Ex. I (Starkey Depo.) at 40:14–41:4 (noting that he typically arrived to work an hour early and, during that hour, would engage in both work-related and personal activities, including reading the newspaper and searching the internet), 50:11–51:17 (stating that his managers likely would have seen him at work early, but acknowledging that they may not have known whether he was there for personal reasons or to do work); Friedman Decl., Ex. X (Starkey Depo.) at 47:24–48:9 (noting that he would arrive early because, given potential traffic issues, he would "rather get there way early than ever be late," and it became "habit" for him to boot up and log in before his shift start); Langeland Decl., Ex. M (Y. Brown Depo.) at 89:24:91–3 (noting that, on days she arrived early, she typically would get her computer started but then might read, get coffee, or "do other things"); Friedman Decl., Ex. E (Bowers Depo.) at 38:14–24 (noting that he would arrive to work twenty to thirty minutes before his shift and, before booting up, would put his lunch away, get coffee, and say hello to his co-workers); id., Ex. I (Coy Depo.) at 35:14–19 (discussing his understanding that some CCRs came in early for breakfast, coffee, "surf[ing] the internet,"

and reading personal e-mail); Langeland Decl., Ex. P (Musgrove Depo.) at 61:7–21 (noting that she observed some CCRs arrive early to "go to the cafeteria, put their lunch away, put their stuff away or grab a drink before they sit down" but never saw CCRs doing work before their scheduled start time); Friedman Decl., Ex. H (Cerny Depo.) at 73:7–74:4 (noting that Opt-in Plaintiff Eva Puckett[20] apparently arrived early regularly to avoid traffic and that, after Cerny told her not to begin working prior to her shift, Puckett would get breakfast during this pre-shift time instead); id., Ex. M (Landery Depo.) at 46:18–47:4 (noting that some CCRs may have arrived early to "get breakfast, grab a cup of coffee"); id., Ex. AA (J. Williams Depo.) at 193:8–194:6 (noting that she never saw Named Plaintiff Seward engaging in work on days that he arrived early but rather saw him talking with his colleagues about sports, reading the newspaper, or browsing the internet).

Some individual opt-ins also acknowledged that, even if they did arrive early to boot up their computers or perform other work before the start of their shifts, their managers may not have known that they were doing so. See Friedman Decl., Ex. F (Y. Brown Depo.) at 101:2–20 (stating that "managers never got [to work] before" the CCRs, so it would be "hard to say" whether her managers knew that she was there early on some days); id., Ex. J (Eyoh Depo.) at 95:7–96:20 (noting that her manager, Michael Landery,[21] was located in Colorado and could not physically see whether she arrived to work early to boot up but stating that he had electronic tools with which he could have determined when she was present); id., Ex. K (Garrett Depo.) at

---

[20] Puckett is mistakenly identified in the deposition transcript as "Ms. Bucket." See Friedman Decl., Ex. H (Cerny Depo.) at 73:10. However, she is identified by the correct name earlier in the transcript. See Langeland Decl., Ex. AA (Cerny Depo.) at 71:17.

[21] Landery's name is misspelled in the deposition transcript as "Landry." See Friedman Decl., Ex. J (Eyoh Depo.) at 95:8.

77:3–6 (noting that his manager, Vicky Reidy, could not physically see him from her desk because "[s]he was on the other side of the building").  To the extent that some managers learned that certain opt-in plaintiffs were arriving early to log in or otherwise engage in pre-shift work, these managers testified that they then instructed those plaintiffs to record that overtime in eTotals so that they would be compensated for it but advised them that this work was not necessary or required and that they should not do this going forward.  See Langeland Decl., Ex. AA (Cerny Depo.) at 69:24–73:17 (regarding Opt-In Plaintiff Eva Puckett); Cerny Decl. at ¶¶ 14–15 (same); MacDonald Decl. at ¶ 13 (regarding Opt-In Plaintiff Michael Rich); Friedman Decl., Ex. AA (J. Williams Depo.) at 191:13–192:6 (regarding Named Plaintiff Charles Seward).

Finally, the testimony of some IBM managers is in direct conflict with the testimony of opt-in plaintiffs who worked on their teams.  In particular, some opt-in plaintiffs who claim that they were expected to boot up before the start of their shifts, and therefore did so, worked for managers who testified that this was not required or expected or worked on teams, or in specific jobs, in which they did not field incoming calls and apparently had no need to be call ready at the start of their shifts.  For example, Opt-In Plaintiff Yame Lee, who testified that she believed she was expected to arrive early to prepare for her shift, was supervised by Wendi Kowren Musgrove, who stated that Lee was "rarely on the telephone in her role" and would not have had to boot up pre-shift to become call ready.  Compare Langeland Decl., Ex. L (Lee Depo.) at 67:11–68:19, with Musgrove Decl. at ¶¶ 8, 10.  Similarly, IBM manager Sara Cerny specifically noted in her declaration that Opt-In Plaintiff Yolanda Brown worked on her Pended QSAR and Entitlement Help Desk teams and was not expected to be call ready at the start of her shifts, yet Brown testified that, although Cerny did not instruct her to do so, she needed to boot up ten to fifteen minutes before the start of her shifts in order to be ready.  Compare Cerny Decl. at ¶¶ 9,

12, with Langeland Decl., Ex. M (Y. Brown Depo.) at 78:8–80:21.  Additionally, Opt-In Plaintiff

Denise Brown testified that IBM manager Pete Starratt instructed her to have her computer up

and running so that she would be call ready at the start of her shift and that time spent booting up

before her shift was part of her "job description;" however, Starratt stated in his declaration that

there was no call-ready requirement on his team, that the CCRs on his team, including Denise

Brown, "were not expected to boot up their computers, log into their computer tools, or perform

any other work prior to the beginning of their scheduled shift," and that he had communicated

these expectations to his CCRs.  Compare Langeland Decl., Ex. GG (D. Brown Depo.) at

60:19–61:25, 76:7–17, 84:8–85:4, 92:2–21, with Starratt Decl. at ¶¶ 6, 8, 11.  Furthermore, data

retained by IBM reflecting the times at which CCRs actually arrived to work apparently also

conflicts with the testimony of at least some plaintiffs who claim to have regularly arrived early

to boot up.[22]

---

[22] IBM employees apparently were required to use a badge to swipe into their buildings
and, in some cases, their floors.  IBM has submitted several hundred pages of badge swipe data,
along with analysis thereof, that it plans to use to support its defenses against the claims of two
opt-in plaintiffs, Thomas Poehnelt and Thomas McDonald, since this data apparently shows that
these plaintiffs did not arrive to work early enough to have time to boot up pre-shift.  See Docket
No. 148 (Ralph Decl., Exs. A–D); see also Ray Decl., Exs. 1–2.

On the other hand, Seward plans to use this data to show that plaintiffs regularly arrived
to work early and thereby attempt to support his argument that they engaged in pre-shift work.
Seward has submitted an expert report analyzing "login and badge swipe data . . . to determine
the daily time differences between first badge swipe time and first [telephone system] login
time" for each plaintiff.  See Langeland Decl., Ex. A at 1.  At his deposition, Seward's expert
acknowledged that he knew little about the job duties of the CCRs, or about the boot-up or other
processes in which the CCRs may have engaged to prepare for work.  See Friedman Reply Decl.,
Ex. F (Madansky Depo.) at 42:16–44:25 (also noting that, with respect to his analysis, he did not
know whether plaintiffs arrived early or late for their scheduled shifts on any particular day or
whether the plaintiffs had worked more than eight hours on any particular day).  It is unclear to
this Court how this data might demonstrate that, simply because plaintiffs swiped into their
building or floor before the start of their shifts, they actually began booting up or otherwise
working before their shifts began.  When asked at oral argument how the badge swipe data was
persuasive to show that plaintiffs actually began working before their shifts began, Seward's

## III. ANALYSIS

### A.    Standard on Motion for Decertification

While the Second Circuit has "not yet provided clear guidance on the standard district

courts should apply to motions seeking certification of a 'collective action' under § 216(b) of

[the] FLSA, . . . the district courts of this Circuit . . . have coalesced around a two-step method."

Myers v. Hertz Corp., 624 F.3d 537, 554–55 (2d Cir. 2010). As noted above, at the first stage,

the court makes an "initial determination to send notice to potential opt-in plaintiffs" where the

named plaintiff has made a "modest factual showing" that he is "similarly situated" to the

proposed opt-ins. Id. (internal quotations omitted). At the second stage of the certification

process, the court, on the basis of a "fuller record," determines "whether the plaintiffs who have

opted in are in fact similarly situated to the named plaintiffs." Id. at 555 (internal quotations

omitted). If not, the court may decertify the action and dismiss the opt-in plaintiffs' claims

without prejudice. Id.

In making its determination at the second stage, the court examines the proposed class

under the following three prongs: (1) common or disparate factual and employment settings of

the individual plaintiffs; (2) defenses available which appear common to all plaintiffs or

individual to each plaintiff; and (3) fairness and procedural considerations. See, e.g., Zivali v.

AT&T Mobility, LLC, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). At this second stage, the

"burden is on the named plaintiff to prove that the other employees are similarly situated" and

"the Court, now afforded a much fuller record, must apply a more stringent standard of proof in

---

counsel stated that this was a "merits issue." See Transcript of December 13, 2011 Hearing at
27:12–28:6.

determining whether plaintiffs are similarly situated for the purposes of the FLSA." Zivali, 784 F. Supp. 2d at 460 (internal quotations omitted).

In some cases, where the record following discovery reveals that only some plaintiffs or claims are actually similar, the Court may decide in its discretion to grant a decertification motion only in part, for example by decertifying particular claims, creating subclasses, or modifying the scope of the class. See Realite v. Ark Rests. Corp., 7 F. Supp. 2d 303, 308 (S.D.N.Y. 1998) (Sotomayor, J.) (granting conditional certification but noting that, "should discovery reveal that plaintiffs in fact are not similarly situated, or that only plaintiffs who worked in the same [location] or who held the same job type are similarly situated, I may later decertify the class, or divide the class into subgroups, if appropriate"); Russell v. Ill. Bell Tel. Co., 721 F. Supp. 2d 804, 813–14 (N.D. Ill. 2010) (decertifying particular claims for which plaintiffs had not demonstrated that they were similarly situated); Burch v. Qwest Comm'cns Int'l, Inc., 677 F. Supp. 2d 1101, 1122–23 (D. Minn. 2009) (decertifying only some claims and noting that "[i]t is within the Court's discretion to clarify and narrow the proposed class in this way in order to ensure that the certified class is consistent with the purposes and requirements of the FLSA"); Frank v. Gold'n Plump Poultry, Inc., No. 04-CV-1018 (PJS/RLE), 2007 WL 2780504, at *5 (D. Minn. Sept. 24, 2007) (creating subclass to ensure that plaintiffs shared "factual similarities" and to enhance "procedural efficiency and case management").

While the factors to be considered in the decertification analysis are quite clear, it is difficult to draw consistent guidelines from the case law on how to apply these factors in particular factual settings. The decertification determination is extremely fact-dependent and appears to be largely in the Court's discretion. As discussed below, the key cases relied upon by Seward and IBM are very difficult to reconcile, as they apply the same standard from divergent

31

perspectives and, accordingly, reach different conclusions on relatively similar facts.[23]

IBM's motion for decertification draws heavily on Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456 (S.D.N.Y. 2011) (Rakoff, J.), in which this Court recently granted Defendant AT&T Mobility's ("Mobility") motion to decertify a class of 4,100 employees who worked in retail stores across the country and had alleged that they were required to engage in various types of uncompensated off-the-clock work. The Court was persuaded by Mobility's argument that these employees were not similarly situated under the three-prong analysis discussed above.

Mobility used a timekeeping system, somewhat similar to IBM's eTotals, that only recorded hours worked when an employee was physically present at the store, but that enabled supervisors to "override the system and retroactively adjust an employee's work hours." Id. at 460. The Court found that Mobility's timekeeping system and "formal policies regarding timekeeping and overtime" were lawful under the FLSA since they "allow[ed] for the complete and accurate recording of all time worked" and "mandate[d] that all overtime, even if not authorized in advance, be paid." Id. at 461–62. Therefore, the Court found, "the fact that the opt-in plaintiffs track their hours using [this timekeeping] system and are subject to Mobility's formal timekeeping policies is insufficient, without more, to demonstrate that plaintiffs are similarly situated for the purposes of a FLSA collective action." Id. at 463.

While the plaintiffs in Zivali conceded that Mobility's formal policies and timekeeping system were lawful, they argued that Mobility's "practices and . . . unwritten expectations created a corporate culture in which FLSA violations are common." Id. at 463. The Court determined that, for these "arguments to be pertinent to certification, however, plaintiffs must

---

[23] Given the scarcity of cases within the Second Circuit addressing the second stage of the certification process in the context of off-the-clock overtime claims, this Court also considers some relevant out-of-circuit opinions cited by the parties.

demonstrate that the 'practices' and 'culture' of which they complain are sufficiently uniform and pervasive as to warrant class treatment." Id. The Court found that the plaintiffs "failed" to make this showing since the "evidence point[ed] to an extremely wide range of company practices in the context of varied factual and employment settings," "the defenses available to Mobility appear to be highly individual to each plaintiff," and therefore "fairness and procedural considerations counsel in favor of decertifying the class." Id. at 464.

Apparently considering the first prong of the "similarly situated" analysis, the Court reviewed the plaintiffs' claim that they had not been compensated for reviewing and responding to work-related electronic communications while they were off duty. The Court found wide variation in the plaintiffs' testimony with regard to management expectations, the extent to which they even received such communications, and whether they were compensated for any such time worked. Accordingly, the Court could not "conclude that Mobility had any uniform business practices or 'culture' across its 2,000-plus retail stores encouraging off-duty electronic communication." Id. at 465. The Court therefore concluded that "plaintiffs [were] not similarly situated with respect to their factual and employment settings." Id. at 467.

On the second, "individual defenses" prong, the Court found that, "[i]n the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." Id. at 468. Because the "record suggests that the knowledge of each individual manager varies widely" and because the "extent to which work [may have been] *de minimis* . . . will necessarily vary widely according to the particular situation of each individual plaintiff," the Court found that "this factor weighs heavily against proceeding with this case as a collective action." Id. Finally, on the third prong, the Court determined that

33

there appeared to be "very few common issues of fact in this case," that the "testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this action," and that "[b]ifurcation of the trial would not resolve the issue as there is no consistent evidence as to either liability or damages." Id. at 468–69. Therefore, "all three relevant factors favor[ed] decertification in this case." Id. at 469.

In contrast, Seward points to two recent out-of-circuit call center cases, Burch v. Qwest Communications International, Inc., 677 F. Supp. 2d 1101 (D. Minn. 2009), and Russell v. Illinois Bell Telephone Co., 721 F. Supp. 2d 804 (N.D. Ill. 2010), in support of his opposition to IBM's decertification motion. In Burch, the court denied a defendant's motion to decertify a class of 1,500 call center representatives who worked in call centers around the country and alleged that they had worked pre-shift boot-up time without receiving compensation for it.[24]  The court found that the named plaintiff had made a sufficient showing that the employees who had opted in to the case were similarly situated. The court noted that the "[p]laintiffs' primary job duties are answering inbound calls from Qwest customers or potential customers and dealing with service or sales issues."[25] Burch, 677 F. Supp. 2d at 1107. The court also found that all plaintiffs were "subject to the same company-wide time monitoring and compensation policies" and that "[p]roduct lines, availability goals, sales goals, type of chains of command, and time monitoring practices are consistent across different call centers." Id. Like IBM, Qwest utilized

---

[24] The court did, however, modify the scope of the class to include only "persons pursuing FLSA violations based on the uncompensated pre- and post-shift work of booting up and shutting down their computers" and to exclude claims based on other types of off-the-clock tasks. See Burch, 677 F. Supp. 2d at 1122–23.

[25] At oral argument, IBM's counsel noted that "[a]ll of the opt-ins in Burch had the job of fielding . . . incoming calls[] at the start of their shift" and that there was a "consistent 'call[-]ready' requirement." See Transcript of December 13, 2011 Hearing at 14:12–21.

a timekeeping system that defaulted to an employee's scheduled time but could be adjusted to reflect overtime.[26] Id. at 1108. Also like IBM, Qwest required its call center employees to log into and out of a telephone system at the start and end of their shifts and monitored this time, but did not base payroll on this data. Id. The court acknowledged that "[p]laintiff testimony about pre-shift work [was] varying" and that evidence of Qwest's knowledge also varied, particularly with regard to management observations, but was bolstered by the fact that Qwest had been subject to a prior lawsuit and internal audit regarding off-the-clock overtime violations. Id. at 1110–12. Despite Qwest's challenge to the existence of a common policy, and despite inconsistent testimony on this issue, the court determined that, "[a]s to the booting up and shutting down allegations, Plaintiffs have provided substantial evidence of a widespread Qwest policy that, in practice, required off-the-clock work." Id. at 1115.

With regard to whether the plaintiffs shared common employment settings, the plaintiffs argued that they "all [had] the same job descriptions and are subject to the same corporate policies," "all had availability goals and sales quotas and were subject to the same time monitoring policies," and "all allege[d] that they worked time for which they were not paid." Id. at 1116. Qwest argued that the employment and factual settings were not similar for various reasons, including the variety of off-the-clock tasks alleged; the amount of time spent working off-the-clock; the differences in call center locations, job duties, and individual manager

---

[26] IBM also noted at oral argument that, in Burch, "the company . . . simply did not provide a mechanism for the employees to record pre[-]shift time, because the type of overtime that was allowed to be submitted or entered . . . related only to calls that went past the end of the shift." See Transcript of December 13, 2011 Hearing at 14:22–15:5. The court in Burch had noted that, under the timekeeping system used by Qwest, employees could "report overtime and receive payment for incidental overtime," but that, in practice, "incidental overtime, as a category, is intended to cover overtime incurred finishing a customer call, not performing the various other off-the-clock activities alleged by Plaintiffs." Burch, 677 F. Supp. 2d at 1119.

practices; Qwest's knowledge of off-the-clock work; and whether plaintiffs actually engaged in pre-shift work and, if so, whether they were required to and how much time they spent doing so.[27] Id. at 1116–20. In particular, Qwest argued that, "because there is no evidence of a uniform plan or policy, Plaintiffs can only show knowledge on a manager-by-manager basis, and knowledge of off-the-clock work by one manager will not be imputed to other managers" and that "this inquiry will require hundreds, or even thousands, [of] individual credibility determinations between each Plaintiff's testimony and his or her managers' testimony, making certification inappropriate." Id. at 1118. The court disagreed, finding, "clear evidence of Qwest's knowledge of the uncompensated [pre-shift boot-up] work, arising from the audit, the apparently widespread nature of the practice, and Plaintiffs' argument that, logistically, these activities had to occur off the clock in order to meet Qwest's requirements regarding availability at the beginning . . . of shifts." Id. Though it acknowledged that there was varying testimony and individual questions related to many of the issues identified by Qwest, the court found, overall, that the opt-in plaintiffs shared a common factual and employment setting. Qwest also presented a number of individual defenses, including that some plaintiffs did not actually perform any off-the-clock work, some plaintiffs received compensation for off-the-clock work that was performed, and some plaintiffs may have engaged only in *de minimis* amounts of off-the-clock work. Id. at 1120–21. Again, however, the court found that most of these defenses presented damages questions or "legal questions that [could] be resolved on a classwide basis" and therefore determined that this factor "weigh[ed] in favor of certification." Id. at 1121.

---

[27] There is no indication in the Burch opinion that Qwest specifically argued, as IBM argues here, that plaintiffs were dissimilar due to the effect that their particular, individual job duties or shift structures may have had on their need to field incoming calls at the start of their shifts.

Finally, the court concluded that a collective action on the pre-shift boot-up claim "would be manageable and preferable." Id.

The court in Russell, 721 F. Supp. 2d, also denied a motion for decertification, finding that the plaintiffs in that case were similarly situated, although it severed some claims that it found to be individualized. In this case, 488 call center employees, who worked in four different call center locations in Illinois, claimed that they were required to work before and after their shifts and during mealtimes without compensation. Id. at 807–08. The plaintiffs claimed that, due to managerial expectations that they be "open and available" for calls at the start of their shifts and monitoring of "adherence" to schedule and "average [call] handle time," it was necessary for them to perform non-call work off the clock. Id. at 809. Several plaintiffs said that they were instructed to be call ready at the start of their shifts which required that they be "logged into the system," and that it could take "anywhere from three to twenty minutes to boot up and load." Id. at 809. As the court noted, "[p]laintiffs claim they inferred from the 'open and available' instruction that they needed to log into their computers and applications prior to their start time." Id. Illinois Bell denied that its managers required the employees to boot up prior to their shifts. Id.

While the court recognized that, "[i]n some cases, the variety of job duties, geographic locations, and salaries at issue may result in claims that are too individualized and difficult for the court to manage collectively," it found that "[b]ecause the plaintiffs in this case have similar job duties and because only four Illinois call centers are at issue, such differences among plaintiffs do not justify decertification here." Id. at 812 n.2. The court did not consider potential differences in the job duties of each plaintiff or in managerial expectations, but did acknowledge

that there would be plaintiff-specific differences with regard to the boot-up process itself.[28]  See id. at 813.  Despite these differences, the court found that the overall question of whether these activities were compensable could be determined across the class and that questions about the amount of time spent by each plaintiff could be determined in a bifurcated, damages portion of the trial.  Id.  The court, however, decertified "individualized claims" for off-the-clock activities that did not fall under one of three court-defined subclasses, one of which was "pre-shift work resulting from logging in [to] computers."  Id. at 814.

The court noted further that, "[i]n [some other] cases, plaintiffs could not show that there was a common practice or policy, because one or relatively few managers gave the unlawful instruction or varying unlawful instructions were provided, resulting in disparate individualized claims."  Id. at 815.  However, in this case, the court was satisfied that the plaintiffs' testimony was sufficiently consistent on the issue of an "open and available" expectation, which, according to plaintiffs, required them to boot up pre-shift, despite the fact that, on the basis of management testimony, Illinois Bell denied that it had imposed such a requirement or was aware that its employees were engaging in this practice.  Id. at 815–17.  Moreover, the court found that the "defenses Illinois Bell claims are individualized appear to be applicable to all plaintiffs or to subclasses."  Id. at 821.  While Illinois Bell argued that questions of whether particular plaintiffs were instructed by managers to be call ready and boot up pre-shift, whether they actually followed this practice, and whether their managers were or should have been aware of this were individualized, the court found that these defenses could "be addressed collectively because the experiences alleged are similar across the case."  Id. at 822.  Because the "plaintiffs share similar

---

[28] As with Burch, there is no indication in the Russell opinion that any of the plaintiffs in that case did not work in positions where they were fielding incoming calls at the start of their shifts.

job duties, and the four call centers implement the same policies, use similar time-keeping methods, and share a similar interest in having representatives regularly answer incoming calls throughout the day, . . . [t]he Court [was] persuaded that these common liability-related questions can be resolved in collective trials even though there [were] some individualized questions." Id. at 823.

        This Court recognizes the parallels that Seward draws between Burch and Russell and the present case. However, this Court is persuaded by the reasoning in Zivali. For the reasons discussed below, this Court finds that, on the basis of the record in this case, Seward has not met his burden of proving that he is similarly situated to the opt-in plaintiffs.

**B.**    **First Prong: Common or Disparate Factual and Employment Settings**

        In determining whether the plaintiffs shared common factual and employment settings, the Court in Zivali first considered whether the defendant's formal policies and timekeeping systems were legal on their face and, finding that they were, next considered whether the plaintiffs had shown that they were subject to a common policy requiring off-the-clock work. IBM contends that Seward has conceded that IBM's formal policies and system are legal and has not shown that "the 'practices' . . . of which [the plaintiffs] complain are sufficiently uniform and pervasive as to warrant class treatment," Zivali, 784 F. Supp. 2d at 463, since the "opt-ins' " different teams had numerous, different work rules and widely disparate functions, purposes, and tasks—all of which directly impacted whether CCRs needed to boot up pre-shift, with the vast majority not being required to boot up pre-shift." Mot. at 5; see also id. at 16–18. Given these various functions and structures, IBM argues that some CCR teams on the whole were under no pressure to be booted up and ready at the start of their shifts. See id. at 8–10. Additionally, IBM argues that, even within particular teams, a CCR's specific role on the team "affected the need to

be call ready." Id. at 10–11.  While IBM acknowledged during oral argument that approximately half of the plaintiffs were responsible for fielding incoming calls at the start of their shifts, it maintains that the other half were not and, therefore, would not be subject to any expectation that they be call ready when their shifts began.  See Transcript of December 13, 2011 Hearing at 5:15–7:12.  Given these disparities, IBM claims that Seward cannot show that the opt-ins were subject to a uniform pre-shift boot-up requirement or, therefore, that they shared common factual and employment settings.

In response, Seward argues that IBM subjected all plaintiffs to a "single illegal practice . . . [of] compensating employees for their *scheduled* time as opposed to their *actual* time worked, which results in the failure to pay for pre-shift computer boot-up or other work" and that the opt-ins' "relevant job duties are strikingly similar."  Opp. at 4 (emphasis in original).  Seward argues that the opt-ins' claims should be "considered at a higher level of abstraction" than that proposed by IBM, see id. at 4–5 (internal quotations omitted) (quoting Frank, 2007 WL 2780504, at *4), and suggests that he need not prove the existence of a uniform policy "when there is a factual or legal nexus binding the Plaintiffs together."  Opp. at 8 (citing Vennet v. Am. Intercontinental Univ. Online, No. 05 C 4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005)).  Seward highlights the fact that the opt-ins (1) "all performed customer service functions, handling inbound and outbound communications with customers;" (2) all worked in the same Riveredge facility; (3) all were subject to IBM's official overtime policies; (4) all "shared the same corporate hierarchy;" and (5) all "tracked their time the same way," using the eTotals system. Id. at 6–8.  At oral argument, Seward also emphasized the fact that all opt-in plaintiff—regardless of whether they worked mostly on fielding incoming calls—all relied on their computers to perform their customer service tasks, even if those tasks included responding

40

to e-mails, performing research, or working on reports and, therefore, they all needed to boot up before they could begin working. See Transcript of December 13, 2011 Hearing at 30:6–25. Seward claims that most opt-ins worked on either the fifth or the ninth floor and that they were supervised by relatively few managers–including Granger and the System X managers–and thus shared a common factual and employment setting. See Opp. at 2, 2 n.6. He claims that "[t]here is no dispute that the CCRs on the ninth floor [on the System X team] were expected to perform pre-shift work to be ready to start handling their customer service duties immediately at their shift time." Id. at 2–3.

Seward does not directly dispute IBM's argument that differences in team functions or structures, or in the expectations of particular managers or job responsibilities of particular plaintiffs, may have made it simply unnecessary, and therefore unexpected by IBM, for at least some of the plaintiffs to boot up their computers before their shifts. While Seward's complaint alleged that the "primary duty" performed by Seward and other similarly situated CCRs was "to field phone calls relating to customer service for IBM,"[29] see Friedman Reply Decl., Ex. A (Amended Complaint) at ¶¶ 14–16, he now seems to characterize the plaintiffs' job duties more broadly, apparently conceding that not all of the plaintiffs who have in fact opted in to this case primarily fielded incoming calls. See Transcript of December 13, 2011 Hearing at 30:14–21 (noting that all plaintiffs were "responding to some kind of customer inquiry" and that they all needed to "have the computer up" to do their jobs), 35:11–21 (suggesting that this Court should not focus on "discrepancies within these different teams" but rather focus on the fact that "[t]hey're all in the call center, and they're all providing some kind of service relating to IBM's

---

[29] In opposition to this Motion, Seward also noted that "[t]he uncompensated pre-shift practice at issue in this case is IBM's failure to pay for time spent by CCRs booting-up [sic] their computers before the start of their shift." Opp. at 2.

products, or they're providing some kind of a function in order to make it possible to service the products"), 37:7–24 (noting that Seward and some opt-in plaintiffs needed to be call ready and that other plaintiffs, including those on Sara Cerny's Pended QSAR team, also had "to have the computer up" and "have [their] applications launched . . . before [their] workday starts"). Seward argues simply that "[t]he fact that each and every one of the plaintiffs does not claim to have performed the exact same tasks every day off-the-clock does not provide a basis for decertifying this action." Opp. at 11. Similarly, Seward does not directly address the testimony of various IBM managers regarding the fact that they did not require or expect the CCRs on their teams to report early to boot up their computers, but rather emphasizes the testimony of Jeff Granger and the e-mails drafted by George Lambousis and Gary Kamprath, arguing that this testimony and documentation provides sufficient evidence to show that all CCRs in the Riveredge facility, including those who have opted in to this case, were subject to a call-ready expectation that required them to work pre-shift. See Opp. at 8–12. However, Seward does not explain why Granger's testimony or the Lambousis or Kamprath e-mails are relevant to showing what may have been expected or required of opt-in plaintiffs who worked on completely different teams.

It seems clear that IBM's timekeeping system and formal overtime policies are legal under Zivali, since they "allow[] for the complete and accurate recording of all time worked by . . . employees" and provide that "all [off-the-clock] work that was actually performed will be paid for." Zivali, 784 F. Supp. 2d at 461–62. There appears to be no dispute that CCRs had the ability to enter overtime exceptions in eTotals to be submitted for management approval. Therefore, this Court next will consider whether the opt-in plaintiffs have shown that the "practices and culture of which they complain are sufficiently uniform and pervasive as to

42

warrant class treatment." Id. at 463 (internal quotations omitted).

As for Named Plaintiff Seward, who worked for manager Juanlyn Williams on an incoming call team, and for opt-in plaintiffs who also worked for Williams or on the System X team or other incoming call teams, the evidence does suggest the existence of a common policy or practice of requiring them to report to work early and boot up their computers pre-shift. Several plaintiffs testified that they believed that management expected for them to engage in this off-the-clock work or that it was necessary for them to do so in order to be call-ready at the start of their shifts, as required by management. See Russell, 721 F. Supp. 2d at 809 (denying decertification where plaintiffs had "inferred from the 'open and available' instruction that they needed to log into their computers and applications prior to start time"); Burch, 677 F. Supp. 2d at 1118 (denying decertification where plaintiffs argued in part that "logistically, these activities had to occur off the clock in order to meet Qwest's requirements regarding availability at the beginning of . . . shifts"); Brennan v. Qwest Commc'ns Int'l, Civil No. 07-2024 (ADM/JSM), 2009 WL 1586721, at *1, *3 (D. Minn. June 4, 2009) (denying decertification of ninety-one network technician plaintiffs who worked in Qwest facilities throughout Minnesota and had shown that they "necessarily had to work before the start of their shifts"). Additionally, the Lambousis and Kamprath e-mails, as well as the testimony of managers Carver, Coy, Williams, and Granger, further suggest that some opt-ins were required or expected to boot up pre-shift.

However, other plaintiffs have indicated that, although they may have engaged in this off-the-clock work, their managers did not necessarily expect them to do so.[30] Others indicated

---

[30] These plaintiffs include Yame Lee, Yolanda Brown, Mora Eyoh, John Bowers, Steve Garrett, Thomas McDonald, Michael Raker, Randle Wasson, and Monica Owens. See Part II.C.4, supra. However, three of these plaintiffs apparently worked under managers whose testimony or documents reflect that they did expect their CCRs to boot up pre-shift: Garrett worked for Coy, Raker worked for Carver and Coy, and Owens worked for Granger. See

43

that they performed job functions for which, according to evidence presented by IBM, they would not need to be call ready at the start of their shifts.[31] The declarations of several managers[32] likewise indicate that opt-in CCRs on their teams were not subject to a common requirement that they boot up before their shifts. Despite Seward's arguments to the contrary, neither the testimony of Jeff Granger, nor the e-mails drafted by George Lambousis or Gary Kamprath, is sufficient to show a common policy, especially in light of conflicting testimony from plaintiffs and other managers. There is no indication that the expectations reflected in the Granger testimony or in the Lambousis or Kamprath e-mails extended to any opt-in plaintiffs other than those who were members of the teams for which Granger or Lambousis were responsible or which Kamprath monitored. See Friedman Reply Decl., Ex. D (Granger Depo.) at 102:24–103:20 (noting that other managers would know best what was required for their teams); Lambousis Decl. at ¶ 6 (noting that he had no supervisory authority over CCRs on teams other than System X); Kamprath Decl. at ¶¶ 3, 9–13 (noting that he only prepared DORs for some teams and, even for those teams, he had no supervisory authority over CCRs or knowledge about managers' instructions to their CCRs regarding arrival times).

This Court recognizes that, on a somewhat cursory review of the record, several facts might suggest that the plaintiffs share common factual and employment settings, including the relatively small number of plaintiffs and the fact that they all worked at the same call center

_____

Langeland Decl., Ex. D.

[31] These plaintiffs include Marla Armour, Gregory Preddy, and Beverly Williams. See Part II.C.4, supra.

[32] These managers include Sara Cerny, Genelle Betterson, John Waters, Pete Starratt, Wendi Kowren Musgrove, Roseanne Davis, Viki Torres, and Michael MacDonald. See Part II.C.3, supra.

location, all performed customer service duties, and apparently all potentially engaged in at least some telephone work. See Russell, 721 F. Supp. 2d at 812 n.2 (finding that, because the call center plaintiffs "in this case have similar job duties" and worked in "only four Illinois call centers," decertification was not justified);[33] Burch, 677 F. Supp. 2d at 1107 (noting that "[p]laintiffs' primary job duties are answering inbound calls . . . and dealing with service or sales issues").[34] However, from the perspective utilized by the Court in Zivali[35]—and adopted by this Court in the present case—Seward has not shown that he shares common factual and employment settings with all of the opt-in plaintiffs due to the existence of a "sufficiently uniform and pervasive" policy requiring off-the-clock work, given the many differences in specific job duties, team functions and structures, managerial expectations, and individual experiences and understandings among the plaintiffs. See Zivali, 784 F. Supp. 2d at 463–67; see also King v. CVS/Caremark Corp., No. 07-21824-Civ., 2008 WL 5973490, at *1, *6 (S.D. Fla. Sept. 11, 2008) (decertifying class of only sixteen pharmacy technician plaintiffs due to "variation in stores, management practices and factual disparities as to each Plaintiff"); Proctor

---

[33] IBM also noted at oral argument that, unlike some of the opt-in plaintiffs in this case, all of the plaintiffs in Russell "had the job of fielding incoming customer calls at the start of their shift." See Transcript of December 13, 2011 Hearing at 16:10–13; Russell, 721 F. Supp. 2d at 823 (noting that defendant had interest in call center representatives "regularly answer[ing] incoming calls throughout the day").

[34] As noted above, at oral argument, IBM noted that this language from Burch actually suggested that, unlike in the present case, all plaintiffs in Burch actually fielded incoming calls. See Transcript of December 13, 2011 Hearing at 14:12–21.

[35] This Court recognizes the distinctions identified by Seward between the facts in Zivali and in the present case, including that there were more than four-thousand plaintiffs in Zivali, while there are only forty here, and that those plaintiffs worked in many retail locations across the United States, while the plaintiffs here worked in only one location. See Opp. at 11–12 (arguing that Zivali is not persuasive given the "divergent factual basis" of that case). Despite these factual differences, however, this Court finds that the reasoning in Zivali is persuasive and applicable to this case given the many individualized issues demonstrated by the record.

v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 279, 281–82, 284 (N.D. Tex. 2008)

(decertifying class of approximately one-thousand retail workers because "there was great

variety in the factual allegations among the individual Plaintiffs," the defendant's official policy

regarding overtime compensation and off-the-clock work was lawful, and plaintiffs had failed to

show the existence of a "single, decision, policy, or plan that [was] causing the Plaintiffs to work

off the clock"). Accordingly, this factor weighs in favor of decertification.

**C.      Second Prong: Common or Individualized Defenses**

On the second prong, IBM argues that, "given the absence of a uniform pre-shift boot-up

requirement, the evidence bearing on *whether* an opt-in booted up pre-shift and, even assuming

he/she did, *why* and *whether* the supervisor was even aware of the work, is highly particularized

and variable by opt-in." Mot. at 5 (emphasis in original). IBM contends that these "highly

individualized defenses . . . need to be examined and resolved on an opt-in by opt-in basis." Id.;

see also id. at 18–23. More specifically, IBM notes that it likely would raise the following

individualized defenses on the "threshold issue of whether opt-ins even worked pre-shift boot-up

time," id. at 18: (1) one opt-in's shift started an hour before his team began taking calls; (2) one

opt-in was not required to shut down after each shift, so therefore did not have to boot up at the

start of the next shift; (3) some opt-ins' duties did not include telephone work so there was no

need to be call ready at the start of their shifts; (4) some opt-ins on teams that handed incoming

calls worked staggered, overlapping shifts or had sister teams in other centers available to cover

calls until they became available; (5) some opt-ins may have arrived at work early to avoid

traffic, for example, but did not actually work pre-shift boot-up time following their arrivals; and

(6) some opt-ins who worked on teams that handled incoming calls and had a pre-shift boot-up

requirement did not actually comply with this requirement, as indicated by data showing that

these employees "swiped in" to the office building only a few minutes before the start of their

shifts. See id. at 18–20.

Additionally, IBM contends that, under Zivali, "[i]n the absence of a company-wide

policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or

constructive knowledge that plaintiffs were performing off-the-clock work without proper

compensation." Id. at 20–21 (quoting Zivali, 784 F. Supp. 2d at 468); see also Singh v. City of

New York, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005). IBM states that it will have "equally

varying defenses as to the element of actual or constructive knowledge," specifically: (1) one

plaintiff's manager was not physically present in the Riveredge facility so would not have

witnessed her engaging in pre-shift work; (2) some managers observed plaintiffs arriving only at

the start of their scheduled shifts; (3) some managers specifically advised plaintiffs to begin

working only at their scheduled shift start times, even if they chose to arrive at the office early,

for example, to avoid traffic; (4) some managers specifically advised plaintiffs that they were not

required to boot up before their shifts began and at least one manager who observed a CCR

performing unrequired pre-shift work directed that CCR to report that overtime in eTotals; and

(5) some managers observed plaintiffs who arrived early engaging in personal activities before

the start of their shifts. See Mot. at 20–23.

As to those opt-ins who actually may have been subject to a team-specific pre-shift boot-

up requirement, IBM claims that it will defend against their claims by showing that they were

aware of the company policy requiring them to report overtime hours and "had access to eTotals,

knew how to use it, and used it before." Id. at 22. However, IBM states, some opt-ins "were

repeatedly told by their managers *not* to boot up pre-shift," while others who "allegedly

performed pre-shift work without recording it . . [provided varying] testimony . . . as to whether

their managers had any way to know about it." Id. at 12–13 (emphasis in original). Therefore, IBM will have yet another defense to the claims of those opt-ins. Finally, IBM argues that it will be able to defend against some opt-ins' claims on the ground that the amount of pre-shift boot-up time they worked, if any, was *de minimis*. Id. at 23; see also Zivali, 784 F. Supp. 2d at 468 (noting that *de minimis* defense "will necessarily vary widely according to the particular situation of each individual plaintiff"). IBM further notes that its damages defenses will be individualized given the "wide variation in the amount of time it took CCRs to boot up their computers." Mot. at 23 n.8.

Seward contends generally that the "purportedly individual defenses raised by IBM are in fact common to many, if not all, Plaintiffs and can be easily resolved on a collective basis with representative evidence and testimony." Opp. at 12. Seward also claims that IBM's alleged defenses regarding IBM's actual or constructive knowledge, varying team policies, and the *de minimis* nature of some CCRs' overtime work are "either legal arguments that apply across the board to the entire class or are damages questions which are irrelevant on a decertification motion." Id. at 13. However, as IBM notes in its reply brief, Seward offers no specific, fact-based arguments about why IBM's defenses are actually common to all plaintiffs. Instead, Seward engages in a discussion of the merits of those defenses, even though the merits are not at issue on this Motion. See Opp. at 12–21.

Additionally, Seward argues that the "nature of the work [performed pre-shift by the plaintiffs] falls into one very discreet, highly-specific category" and that IBM's potential defenses about whether CCRs were expected or required to perform pre-shift work are irrelevant because the issue is that the plaintiffs were in fact performing this work without compensation and their managers were on notice. See id. at 17–18. Finally, Seward argues that any defenses

48

IBM intends to raise regarding how much time each CCR actually spent booting up her computer, including whether such time may have been *de minimis*, is a damages issue and has no bearing on whether the opt-ins are similarly situated. Id. at 19–21.

IBM's claim that its defenses will be individualized is persuasive in light of disparities in the testimony of both plaintiffs and managers with regard to whether pre-shift work was necessary or expected, whether plaintiffs actually engaged in such work and, if so, how much time they spent booting up, and whether managers knew or should have known that plaintiffs were engaging in this work. IBM's planned use of badge swipe data to defend against some claims also is necessarily individualized. Other than damages-related questions of how much time different plaintiffs may have spent booting up, most of these "highly fact specific," individualized defenses relate to liability and therefore could not be resolved simply by bifurcation.[36] See Zivali, 784 F. Supp. 2d at 468. This Court recognizes that, in some call center cases involving many plaintiffs, other courts have determined that defenses were not so individualized as to defeat certification. See Russell, 721 F. Supp. 2d at 813, 815–17, 821–22 (noting that damages question of how much time various plaintiffs spent booting up could be determined in a bifurcated portion of trial; finding that "defenses Illinois Bell claims are individualized appear to be applicable to all plaintiffs or to subclasses" despite management testimony denying that it imposed an off-the-clock requirement or had knowledge; noting that questions of knowledge could be determined by a "fact finder . . . based on the evidence presented to it;" and determining that questions of whether plaintiffs were instructed to boot up

---

[36] While this Court does not believe that they could be determined fairly on a class-wide basis, it acknowledges that some manager-dependent defenses, including those related to manager expectations, team-specific job functions, and staggered shift structures, potentially could be addressed on a team-wide, as opposed to individual, basis.

pre-shift, whether they actually did so, and whether their managers knew "may be addressed

collectively because the experiences alleged are similar across the case"); Burch, 677 F. Supp.

2d at 1118, 1121 (finding, where defendant had raised similar defenses as IBM, that most of

these defenses presented "legal questions that [could] be resolved on a classwide basis" and

indicating that knowledge was a "clear" issue, in part, given prior internal audit investigating

off-the-clock work); Brennan, 2009 WL 1586721, at *6 (finding that "liability will turn largely

on the class-wide question of whether [defendant] knew or should have known" that plaintiffs

were working off the clock). However, in the present case, IBM has demonstrated that its

potential defenses are "highly fact specific," Zivali, 784 F. Supp. 2d at 468, and, therefore, likely

will depend on the testimony of individual plaintiffs and managers and on individualized badge

swipe data. Seward has presented no specific facts or arguments to persuade this Court

otherwise. Therefore, this factor also weighs in favor of decertification. See id. (determining

that the individualized defenses factor "weigh[ed] heavily against proceeding . . . as a collective

action" because the "record suggests that the knowledge of each individual manager varies

widely" and the "extent to which work [may have been] de minimis . . . will necessarily vary

widely according to the particular situation of each individual plaintiff"); King, 2008 WL

5973490, at *5 (finding, in case with only sixteen plaintiffs, that defenses would be too

individualized to proceed as a collective action); Proctor, 250 F.R.D. at 282–83 (finding that

plaintiffs' claims varied from "manager to manager" and were "factually disparate" and

therefore defenses also would be individualized).

**D.    Third Prong: Fairness and Procedural Considerations**

IBM argues that it would be "highly unfair" to all parties to try these claims collectively

since the "liability determination as to Seward or any particular opt-in will not control the

liability determination as to another opt-in." Mot. at 6. IBM also argues that "no jury, no matter how attentive, could track and compartmentalize which evidence and defenses relate to each of 40 different plaintiffs." Id. IBM claims that, if this case proceeds as a collective action, "the Court would essentially need to conduct a series of opt-in specific mini-trials . . . which would raise serious questions . . . concerning the fairness, manageability and meaningfulness of the procedure." Id. at 25 (internal quotations omitted) (citing Lusardi v. Xerox Corp., 118 F.R.D. 351, 370–71 (D.N.J. 1987)). Because "[t]rying multiple, varying claims in a single action is legally prohibited where it would confuse the jury and prejudice the parties," id. at 24 (citing Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 352 (2d Cir. 1993)), IBM argues that this collective action must be decertified. IBM contends that representative testimony would not be permissible in this case because it "is only allowed when the circumstances of opt-ins are uniform—a far cry from the instant case." Reply at 9. IBM also argues that bifurcation would not make it possible for the case to proceed collectively since "there is no consistent evidence as to either liability or damages." Id. (internal quotations omitted) (quoting Zivali, 784 F. Supp. 2d at 469).

In contrast, Seward emphasizes the remedial nature of the FLSA and focuses on the difficulty that the opt-ins would face if required to bring individual actions, noting that collective action may be the "only cost effective and economically viable way" to bring these claims. See Opp. at 21–23. Seward also argues that "a close call as to whether the plaintiffs are similarly situated should be resolved in favor of certification," id. at 22 (internal quotations omitted) (quoting Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 926 (D. Minn. 2010)), although IBM argues that "this is simply not the standard in the Second Circuit." Reply at 9 n.8 (citing Zivali, 784 F. Supp. 2d at 460). Seward characterizes the "facts and evidence" in this case as

51

"identical" and argues that "adjudicat[ing these claims] in 40 separate trials . . . . would waste judicial resources . . . [and] be unfair and unduly prejudicial to Plaintiffs." Opp. at 22–23. Seward also argues that this Court "has procedural tools at its disposal to make the case more manageable, such as the use of representative testimony and bifurcation." Id. at 23.  However, Seward does not make specific proposals for how these tools might be used in this case.  Finally, Seward claims that it would be an "immense" waste of time and resources to conduct forty separate trials where, for example, George Lambousis or Jeff Granger would be called to testify several times. See Transcript of December 13, 2011 Hearing at 31:16–21.

The determination of this third factor appears largely to depend on the Court's analysis under the first two factors of the test.  In other words, if a court finds that the plaintiffs share common factual and employment settings and that defenses are not individualized, then fairness and procedural considerations weigh in favor of certification.  See Russell, 721 F. Supp. 2d at 823 (finding that, through the use of subclasses and bifurcation, "common liability-related questions can be resolved in collective trials even though there are some individualized questions" after finding that other two factors weighed against decertification); Burch, 677 F. Supp. 2d at 1121 (finding, as to third factor, that collective action "would be manageable and preferable," after finding that other two factors weighed against decertification).  On the other hand, where plaintiffs do not share common factual and employment settings and defenses are individualized, then this third factor weighs against proceeding as a collective action. See Zivali, 784 F. Supp. 2d at 468–69, 469 n.37 (noting that this third factor weighed against certification because "the testimony of the plaintiffs is not representative" and "[b]ifurcation . . . would not resolve the issue as there is no consistent evidence as to either liability or damages" and quoting Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 574 (E.D. La. 2008), as follows: "[T]he

52

more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater

doubts there are about the fairness of a ruling on the merits—for either side—that is reached on

the basis of purportedly representative evidence."); <u>King</u>, 2008 WL 5973490, at *5–6 (finding

that "significant procedural and fairness concerns" had been raised and that representative

testimony would not be appropriate "based on the variation in stores, management practices and

factual disparities as to each Plaintiff"); <u>Proctor</u>, 250 F.R.D. at 283–84 (finding that this factor

weighed against certification where plaintiffs' claims were "factually disparate").

     In the present case, this Court finds that this factor, like the preceding two, weighs in

favor of decertification. Although representative testimony might be appropriate on some issues,

such as management requirements or the functions of different teams, and bifurcation could

potentially be used to determine individual damages questions, overall, fairness requires that this

collective action be decertified given the various individualized issues presented in the case. <u>See</u>

<u>Zivali</u>, 784 F. Supp. 2d at 468–69; <u>King</u>, 2008 WL 5973490, at *5–6 ; <u>Proctor</u>, 250 F.R.D. at

283–84.

**E.**    **Consideration of a Potential Subclass**

     There is a close question as to whether Named Plaintiff Seward is similarly situated at

least to those opt-in plaintiffs who worked on teams or in positions where their predominant

responsibility was to field incoming calls, in light of evidence in the record suggesting that there

may have been a common expectation that these particular plaintiffs be call ready at the start of

their shifts. Accordingly, this Court considered whether IBM's motion should be granted only in

part and the scope of the class modified to permit these "incoming call" plaintiffs to proceed

collectively, while decertifying the more individualized claims of those plaintiffs whose primary

job duties would not require them to be call ready before their shifts begin. <u>See Realite v. Ark</u>

53

Rests. Corp., 7 F. Supp. 2d 303, 308 (S.D.N.Y. 1998) (Sotomayor, J.) (granting conditional

certification but noting that, "should discovery reveal that plaintiffs in fact are not similarly

situated, or that only plaintiffs who worked in the same [location] or who held the same job type

are similarly situated, I may later decertify the class, or divide the class into subgroups, if

appropriate"); Russell, 721 F. Supp. 2d at 813-14 (decertifying particular claims for which

plaintiffs had not demonstrated that they were similarly situated); Burch, 677 F. Supp. 2d at

1122–23 (decertifying only some claims and noting that "[i]t is within the Court's discretion to

clarify and narrow the proposed class in this way in order to ensure that the certified class is

consistent with the purposes and requirements of the FLSA"). However, neither party has

requested such an approach, and IBM specifically objected to it during oral argument on the

ground that it would be unfair at this stage of the litigation. See Transcript of December 13,

2011 Hearing at 20:9–21:4. In light of these considerations, and because this Court finds that

Seward is not similarly situated to all opt-in plaintiffs on the whole, I recommend that IBM's

motion for decertification be granted.

## IV. CONCLUSION

For the reasons set forth above, I conclude—and respectfully recommend that Your

Honor should conclude—that the Motion be GRANTED.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Hon. Vincent L. Briccetti, at the Hon. Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.

Dated: January 20, 2012
       White Plains, New York

                              Respectfully Submitted,

                              Paul E. Davison
                              United States Magistrate Judge
                              Southern District of New York

# EXHIBIT "4"

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

TISHA CREEL, on behalf of )
herself and others )
similarly situated, )
                                  )
        Plaintiff, )
                                  )      CIVIL ACTION NO.
    v. )         2:09cv728-MHT
                                  )          (WO)
TUESDAY MORNING, INC., )
                                  )
        Defendant. )

OPINION AND ORDER

Plaintiff Tisha Creel brings this action under the

Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, on

behalf of herself and others similarly situated, claiming

that defendant Tuesday Morning, Inc. violated the FLSA by

failing to pay her overtime wages.  The jurisdiction of

the court is properly invoked pursuant to 29 U.S.C.

§ 216(b) and 28 U.S.C. § 1331.  This matter is now before

the court on Creel's motion to conditionally certify a

national collective action and facilitate class notice

pursuant to 29 U.S.C. § 216(b).  For the reasons that

follow, the court will deny Creel's motion, albeit without prejudice.

## I.   BACKGROUND

Creel is a former employee of Tuesday Morning, a retailer that sells brand name merchandise at discounted prices at 841 stores in 46 states.  Creel alleges that Tuesday Morning, as a matter of company policy, failed to pay her and other similarly situated "store managers" overtime compensation, in violation of 29 U.S.C. § 207(a), despite the fact that they routinely worked over 40 hours a week for a weekly salary.  Creel asserts that she was routinely required to work 50-60 hours a week at a Tuesday Morning store in Alabama.

Creel contends that Tuesday Morning's company policy misclassifies store managers under the executive exemption of the FLSA.  She argues that she should have been treated as a non-exempt employee and paid overtime because most of her job duties were non-managerial. Creel has provided deposition testimony from Judy Miller,

2

the regional manager of 15 Tuesday Morning locations in Georgia and Alabama. Miller's testimony indicates that store managers perform a range of manual labor and non-managerial tasks at Tuesday Morning stores. The testimony also indicated that store managers have limited discretion to change store hours, contract with service vendors, purchase supplies, choose merchandise sold, and hire, promote or terminate staff. Miller also testified that Tuesday Morning uses one training manual to outline policies and procedures for store managers. Creel offers this testimony as evidence that store managers principally engage in non-managerial tasks and that their job duties are dictated by a uniform-company policy.

Creel has also submitted four affidavits from current or former employees who held or hold manager positions at Tuesday Morning stores in Alabama and other States: Brandon Johnson (Alabama), Dwan Benn (Alabama), Dawn Rush (Florida), Linda Trombello (Illinois). All four declarants state that they "routinely worked in excess of

3

forty ... hours per week" and "did not receive overtime compensation."


## II.  LEGAL STANDARD

As stated, Creel asserts that Tuesday Morning violated the FLSA, as codified at 29 U.S.C §§ 207(a)(1) & 215(a)(2).  Section 207(a)(1) provides in relevant part that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  Section 215(a)(2) provides that it shall be unlawful to violate § 207.

Section 216(b) of the FLSA authorizes a plaintiff seeking relief to bring a collective action on behalf of similarly situated persons subject to the requirement that any person who wishes to become a part of the collective action must file a written consent in the court in which such action is brought.  29 U.S.C.

4

§ 216(b); <u>Davis v. Charoen Pokphand (USA), Inc.</u>, 303 F.Supp.2d 1272, 1274 (M.D. Ala. 2004) (Thompson, J.).

In <u>Hoffmann-LaRoche, Inc. v. Sperling</u>, 493 U.S. 165 (1989), the Supreme Court clarified the district court's authority to facilitate § 216(b) FLSA notice.  The Court found that early participation by the district court in the notice process serves a number of important goals. Judicial oversight of the contents of notice protects against misleading communications and misuse of the class device, <u>id</u>. at 171, and enables the court to resolve disputes about the contents of the notice before it is sent out, <u>id</u>.  District court involvement also ensures that all potential plaintiffs receive timely notice of a pending suit and thus prevents the proliferation of individual suits arising from the same allegedly illegal activity.  <u>Id</u>. at 172.  Also by setting a cut-off date for the receipt of consents, the court can expedite resolution of the action.  <u>Id</u>.  For all of these reasons, the Supreme Court concluded that a district court "ha[s] discretion, in appropriate cases, ... [to] facilitat[e]

5

notice to potential plaintiffs" in actions brought under § 216(b) of the FLSA. Id. at 169, 171. Similarly, the Eleventh Circuit Court of Appeals has stated that "the broad remedial purpose of the Act ... is best served if the district court is deemed to have the power to give such notice to other potential members of the plaintiff class to 'opt-in' if they so desire." Dybach v. Florida Dep't of Corr., 942 F.2d 1562, 1567 (11th Cir. 1991) (citation omitted).

Before intervening in the notice procedure, a "district court should satisfy itself that there are other employees ... [1] who desire to 'opt-in' and [2] who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." Morgan v. Family Dollar Stores, 551 F.3d 1233, 1259 (11th Cir. 2008) (quoting Dybach, 942 F.2d at 1567-68). To satisfy the "similarly situated" requirement, plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative class members." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d

1208, 1217 (11th Cir. 2001) (quoting Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996)). Thus, "[a] unified policy, plan, or scheme ... may not be required to satisfy the ... 'similarly situated' requirements of § 216(b)." Id. at 1219 (internal quotations omitted).

In Hipp, the Eleventh Circuit recommended a two-tiered procedure that district courts should use in certifying collective actions under § 216(b). 252 F.3d at 1218.

> "The first determination is made at the so-called 'notice stage.' At the notice stage, the district court makes a decision--usually based only on the pleadings and any affidavits which have been submitted--whether notice of the action should be given to potential class members.
>
> "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class. If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action throughout discovery.

"The second determination is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives-- i.e., the original plaintiffs--proceed to trial on their individual claims."

Hipp, 252 F.3d at 1218 (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995)). District courts have generally applied the Hipp two-stage framework. See, e.g., Cameron-Grant v. Maxim Healthcare Servs., Inc., 347 F.3d 1240, 1242 n.2 (11th Cir. 2003) ("Since Hipp, the district courts in our circuit have utilized the two-tiered approach.").

At the notice stage, "[t]he plaintiffs bear the burden of demonstrating a 'reasonable basis' for their claim of class-wide discrimination." Grayson v. Kmart

8

Corp., 79 F.3d 1086, 1097 (11th Cir. 1996).   "[T]he
standard for determining similarity, at this initial
stage, [is] 'not particularly stringent,' ... 'fairly
lenient,' ... 'not heavy,' ... and 'less stringent than
that for joinder under [Fed.R.Civ.P.] 20(a) or for
separate trials under [Fed.R.Civ.P.] 42(b).'"   Morgan,
551 F.3d at 1260-61 (quoting Hipp, 252 F.3d at 1218).
"The plaintiffs may meet this burden ... by making
substantial allegations of class-wide discrimination,
that is, detailed allegations supported by affidavits
which 'successfully engage defendants' affidavits to the
contrary.'"   Grayson, 79 F.3d at 1097 (quoting Sperling
v. Hoffman-LaRoche, 118 F.R.D. 392, 406-07 (D.N.J. 1988)
(Ackerman, J.)).   "The rationale for the 'fairly lenient
standard' [at the 'notice stage'] is that at the early
stages of litigation, plaintiffs have not had time to
conduct discovery and marshal their best evidence."
Davis v. Charoen Pokphand (USA), Inc., 303 F.Supp.2d
1272, 1276 (M.D. Ala. 2004) (Thompson, J.) (citing Hipp,
252 F.3d at 1218).

Tuesday Morning contends that, because the parties have conducted discovery, the court should "apply a more rigorous standard than that called for by Hipp" before facilitating class notice.  Id. If by "rigorous," Tuesday Morning is suggesting that the court should apply a 'harsher' or 'more demanding' standard, this court in Davis did not mean that.  Instead, the court meant that, because the parties had conducted some discovery, the court could, and should, be 'more accurate' in its assessment of whether a collective action is warranted. As this court stated, a more rigorous standard is appropriate when parties have conducted "extensive discovery" and can "marshal their best evidence."  Id. In short, the court should make use of whatever information it has available at the time; it would be a waste of judicial resources to do otherwise.  Indeed, it would be illogical and wasteful to all concerned to certify a collective action if the evidence is already sufficient to indicate that a decertification is likely to follow.

## III.  DISCUSSION

Creel "seeks to represent all 'similarly situated' Store Managers employed by Tuesday Morning who were subject to the company's uniform policy of not paying its managers one and one-half times their hourly wage for time worked in excess of forty (40) hours per work week during the three (3) years prior to filing of the Complaint." Pl's Mot. Conditional Class Cert. (Doc. No. 19) at 1. Creel has moved for the court to facilitate notice to the class by (1) granting conditional class certification; (2) allowing nationwide notice to be sent to all managers currently employed by Tuesday Morning or previously employed within three years of the filing of Creel's suit; and (3) directing Tuesday Morning to provide contact information for all such employees.

Tuesday Morning contends, among other things, that Creel has not established that she is similarly situated to other members of the putative class.  Courts have affirmed the existence of other employees who desire to opt-in on the basis of affidavits of other employees,

11

Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358, 362 (M.D. Ala. 1999) (Albritton, C.J.) (affidavits from 15 other employees); White, 204 F.Supp.2d at 1316 (affidavits from three other employees), consents to join the lawsuit filed by other employees, Tucker v. Labor Leasing, Inc., 872 F.Supp. 941, 947-48 (M.D. Fla. 1994) (Schlesinger, J.), and expert evidence on the existence of other similarly-situated employees, Barron v. Henry County School Sys., 242 F.Supp.2d 1096, 1105 (M.D. Ala. 2003) (Albritton, C.J.). Courts have been clear, however, that a plaintiff's mere stated belief in the existence of other employees who desire to opt-in is insufficient, Horne v. United Servs. Auto. Ass'n, 279 F.Supp.2d 1231, 1236 (M.D. Ala. 2003) (Albritton, C.J.), and that "unsupported expectations that additional plaintiffs will subsequently come forward" are also insufficient, Mackenzie v. Kindred Hosps. East, L.L.C., 276 F.Supp.2d 1211, 1220 (M.D. Fla. 2003) (Merryday, J.).

Creel has met her "burden of demonstrating a reasonable basis for crediting the[] assertions that

12

aggrieved individuals exist[] in the broad class ... proposed." <u>Haynes v. Singer Co., Inc.</u>, 696 F.2d 884, 887 (11th Cir. 1983). Here, Creel introduces more than her own statement that other potential class members exist. <u>Horne</u>, 279 F.Supp.2d at 1236; <u>Mackenzie</u>, 276 F.Supp.2d at 1220. Four other managers in three States have submitted affidavits indicating their consent to join the lawsuit as party plaintiffs. Thus, the court concludes that Creel has carried her low burden of demonstrating that other aggrieved individuals exist in her proposed class and that some desire to opt-into her suit.

The last inquiry is whether the proposed class consists of similarly situated individuals. To satisfy the "similarly situated" requirement, plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative class members." <u>Hipp</u>, 252 F.3d at 1217. "A unified policy, plan, or scheme ... may not be required to satisfy the more liberal 'similarly situated' requirements of § 216(b)." <u>Id</u>. at 1219 (internal quotations omitted).

13

Cases from district courts show a variety of approaches to applying the "similarly situated" requirement. Some cases have focused on the similarity between job responsibilities and pay provisions of plaintiffs and those of the proposed class. See, e.g., Bradford v. Bed Bath & Beyond, Inc., 184 F.Supp.2d 1342, 1345 (N.D. Ga. 2002) (Story, J.) ("The only determinative issue is whether Plaintiffs' job duties were similar."). Other decisions, most notably a series of opinions authored by former Chief Judge Albritton of this court, have required evidence of a factual or legal nexus between plaintiff's claims and the claims of the proposed class. For example, in White v. Osmose, Inc., 204 F.Supp.2d 1309, 1314 (2002), he wrote: "[A] plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions. Without such a requirement, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready

14

opportunity for abuse." See also Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007) (citing White's nexus requirement approvingly, but at the second stage of the Hipp analysis).  Finally, at least one court has employed a multi-factor approach.  See Stone v. First Union Corp., 203 F.R.D. 532, 542-43 (S.D. Fla. 2001) (Gold, J.).

Without committing to a single approach for all future cases, the court concludes that the similarly situated requirement can be met either by showing similarity between job responsibilities and pay provisions of plaintiffs and proposed class members or by providing evidence of a nexus between plaintiff's claims and the claims of the proposed class.

Of course, the broader and more numerous and complex the collective action the plaintiff wants, the more careful the court must be.  The consequences of decertification (wasted resources for all involved) for a class that has few members and simple and legal factual issues would be dramatically different from the

15

decertification consequences of a class with a huge membership and extremely complex legal and factual issues. In short, the court must be reasonably certain that the proposed litigation is not biting off more than can be chewed.

Here, Creel is asking that the court certify a 'national' collective action. Such a putative collection would, therefore, span the entire nation and, according to the evidence, include over 1250 members. However, after extensive discovery, Creel has presented, in addition to her own testimony, affidavits from only four other store managers and from only two other States (Florida and Illinois). This evidence does not provide an adequate platform from which to make the grand leap to a national collective action.

Admittedly, Creel has also established that Tuesday Morning uses one training manual to outline policies and procedures for store managers and that store managers are trained in Dallas, Texas. However, in assessing this evidence, the court cannot turn a blind eye to the

16

observations made by a California appellate court, <u>Keller</u> <u>v. Tuesday Morning, Inc.</u>, 179 Cal. App. 4th 1389 (Cal. App. 2d Dist. 2009),in upholding the decertification of a class of store managers who claimed that they were entitled to overtime compensation because they did not qualify for the overtime exemption under the California wage-and-hour laws. There, the appellate court held that, although store managers have the same written job description, many other factors (including the size of stores, the number of employees at stores, the location of the stores, the configuration of the stores, and the amount of store sales) all result in store managers performing their duties in significantly different ways. The court therefore concluded that the amount of time each store manager spends performing managerial and non-managerial duties varies too much for them to be considered similarly situated. To be sure, the California court was applying state law and state class-certification rules and was deciding whether a class should be

17

decertified; nevertheless, that court's observations are still instructive.

Moreover, consistent with the observations from the California appellate court, Tuesday Morning has submitted substantial evidence that many of its store managers perform duties quite different from those of Creel.

Of course, if Creel had restricted herself to stores of only a certain location and size and other limiting characteristics, a collective-action certification might very well be appropriate.  The platform here might then be adequate for such a substantially more modest leap.

Certification of a national collective action is not warranted here.

***

Accordingly, it is ORDERED that plaintiff Tisha Creel's motion for class certification (doc. no. 19) is denied without prejudice.

DONE, this the 6th day of May, 2013.

___/s/ Myron H. Thompson___
UNITED STATES DISTRICT JUDGE

# EXHIBIT "5"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARY WEBBER and KELLY MARTIN,

        Plaintiffs,

v.                        Case No.  8:12-cv-1505-T-33AEP

COAST DENTAL, P.A. and COAST
DENTAL OF GEORGIA, P.C.,

        Defendants.

_____/

### ORDER

Plaintiffs Mary Webber and Kelly Martin are dental hygienists who claim that Defendants, Coast Dental, P.A., and Coast Dental of Georgia, P.C., their respective former employers, violated the Fair Labor Standards Act by failing to make overtime payments.  Plaintiffs filed a Motion to Conditionally Certify a FLSA Class Action and Facilitate Notice of Potential Class Members (Doc. # 34) on December 17, 2012.  Defendants filed their Response in Opposition to the Motion on January 8, 2013 (Doc. # 41), and Plaintiffs filed a Reply (Doc. # 46) with leave of Court on January 21, 2013.  As explained below, the Court denies the Motion.

## I.   **Background**

Webber filed her FLSA complaint against Coast Dental, P.A., on July 5, 2012. (Doc. # 1).  On December 17, 2012, with leave of Court, Webber filed an Amended Complaint naming Kelly

Martin as an additional plaintiff and naming Coast Dental of Georgia, P.C. as an additional defendant. (Doc. # 33).  Two individuals have filed notices of consent to join: Laura Tirico (Doc. # 9) and Angela Neal (Doc. # 13).[1]

At this stage of the proceedings, Plaintiffs seek conditional certification of this case as a collective action consisting of all "current and former full-time Dental Hygienists who worked for Defendants in Florida and Georgia . . . who earned less than $100,000 per year for any year of their employment within the statute of limitations." (Doc. # 34 at 21).  Among other arguments, Defendants posit that conditional certification is not appropriate because Plaintiffs have not demonstrated that there are other employees who desire to opt into the litigation or that these other employees, if any, are similarly situated with respect to their job requirements and pay arrangements.  As will be discussed below, based on Plaintiffs' insufficient showing, the Court denies conditional certification.

## II.  **Legal Standard**

The Fair Labor Standards Act expressly permits collective

---

[1] On February 14, 2013, Plaintiffs attempted to file what they purport to be an additional notice of consent to join (Doc. # 47).  However, nothing is attached to the document.

actions against employers accused of violating the FLSA's mandatory overtime provisions. See 29 U.S.C. § 216(b) ("[a]n action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."). In prospective collective actions brought pursuant to Section 216(b), potential plaintiffs must affirmatively opt into the collective action. Id. ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

The Eleventh Circuit has recommended a two-tiered procedure for district courts to follow in determining whether to certify a collection action under § 216(b). Cameron-Grant v. Maxim Healthcare Servs., Inc., 347 F.3d 1240, 1242 (11th Cir. 2003)(citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1218 (11th Cir. 2001)). The first tier, known as the notice stage, is relevant here. "At the notice stage, the district court makes a decision--usually based on the pleadings and any affidavits which have been submitted-- whether notice of the action should be given to potential class members." Id. at 1243.

The Court must determine whether there are other

employees who desire to opt-in and whether those employees are similarly situated. Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1258 (11th Cir. 2008); Dybach v. State of Fla. Dep't of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991). This determination is made using a "fairly lenient standard." Hipp, 252 F.3d at 1218.   The Plaintiffs bear the burden of showing a reasonable basis for the claim that there are other similarly situated employees who desire to join in the litigation.   Essentially, at this stage of the proceedings, the Court must determine whether there are other of Defendants' dental hygienists who are similarly situated and who desire to opt in.   Dybach, 942 F.2d at 1567-68.

III. **Analysis**

Defendants indicate that approximately 184 individuals would potentially fit within Plaintiffs' proposed class definition.[2]   However, only four individuals, Webber, Martin, Tirico, and Neal have expressed interest in this suit.   No current employees of Defendants have joined this action.   No one has joined this action since September 18, 2012, when Neal

---

[2] Coast Dental employed approximately 121 full time dental hygienists in Florida during the class period, and Coast Dental of Georgia employed approximately 63 full time dental hygienists during the class period. (Adams Decl. Doc. # 41-1 at ¶¶ 7-8).

4

joined the action. (Doc. # 13).

Webber, Martin, and Tirico have each filed an affidavit representing that there may be other individuals who are interested in joining the litigation.   Webber indicates, "Since this lawsuit began, I have talked to other hygienists who would be interested in this lawsuit if it were certified as a class action.  Some are afraid to join currently because they still work for Coast Dental but would like to be a part of it if given the chance." (Webber Aff. Doc. # 34-3 at 2, ¶ 6).   Martin similarly states, "I have talked to other hygienists, such as Stephanie Mataski and Johanna Duron, who are interested in joining this lawsuit.  I believe that if other hygienists from Coast Dental get notice of this lawsuit, many will want to join." (Martin Aff. Doc. # 34-3 at 23, ¶ 6). Last, Tirico indicates, "I have talked to other Coast Dental Hygienists who are interested in joining this lawsuit, such as Velvet Holbert and Audra Tharpe. Some are afraid to join currently because they still work for Coast Dental." (Tirico Aff. Doc. # 34-3 at 25, ¶ 7).

Months have transpired since the submission of these affidavits, and none of the individuals mentioned, or anyone else for that matter, have filed a notice of consent to join.

As noted, Plaintiffs bear the onus of demonstrating that

there are other employees who desire to opt into the ligation and that these other employees are similarly situated with respect to their job requirements and pay arrangements. Dybach, 942 F.2d at 1567-68. "In making this showing, a plaintiff cannot rely on speculative, vague, and conclusory allegations." Manzi v. Hartman & Tyner, Inc., No. 11-cv-60426, 2011 U.S. Dist. LEXIS 73562, at *5 (S.D. Fla. July 8, 2011). Further, "mere belief or unsupported expectations that additional plaintiffs will come forward are insufficient to justify certification." David v. Associated Out-Door Clubs, Inc., No. 8:09-cv-1541-T-30MAP, 2010 U.S. Dist. LEXIS 50507, at *3 (M.D. Fla. Apr. 27, 2010).

Although Plaintiffs' initial burden is minimal, it cannot be met based on what Plaintiffs have tendered to this Court. Considering the number of dental hygienists who would fall within the class definition (184), the duration of this suit (8 months), and the paucity of individuals who have joined in the litigation (4), the Court determines that Plaintiffs have failed to meet their burden of providing sufficient evidence that other employees want to join this action.

As explained in Mackenzie v. Kindred Hospitals East, LLC, 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003), certification of a collective action and notice to a potential class is not

6

appropriate to determine *whether* there are others who desire to join the lawsuit. Rather, a showing that others desire to opt in is required before certification and notice will be authorized by the Court. Id.

"[T]he FLSA has a broad remedial purpose, but . . . courts, as well as practicing attorneys, have a responsibility to avoid the stirring up of litigation through unwarranted solicitation." Holt v. Rite Aid Corp., 333 F. Supp. 2d 1265, 1274-75 (M.D. Ala. 2004). Accordingly, conditional certification should "be exercised with discretion and only in appropriate cases." Haynes v. Singer Co., Inc., 696 F.2d 884, 886 (11th Cir. 1983). The Court exercises its discretion to deny conditional certification in the present case. However, in an abundance of fairness to the two individuals who have filed notices of consent to join in the litigation, the Court will allow Laura Tirico and Angela Neal to join this action as party plaintiffs.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiffs' Motion to Conditionally Certify a FLSA Class Action and Facilitate Notice of Potential Class Members (Doc. # 34) is **DENIED.**

(2) Laura Tirico and Angela Neal are joined as Plaintiffs in

7

this action.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this

<u>11th</u> day of March, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record

8